KATHERINE HANNA EVERHART, Plaintiff v. O'CHARLEY'S INC., Defendant

No. COA08-1454

(Filed 6 October 2009)

**1. Evidence— punitive damages—evidence of prior lawsuit— opened door**

The trial court did not err during the punitive damages phase of a negligence trial by admitting evidence of prior allegations that a customer had been served bleach in another of defendant's restaurants. Defendant "opened the door" to such evidence.

**2. Damages and Remedies— punitive damages—motion for judgment not withstanding the verdict (JNOV)**

The trial court did not err in a negligence and breach of implied warranty of merchantability case arising from a restau-

rant serving a customer cleaning solution by denying defendant's motion for (JNOV) on the issue of punitive damages. The evidence was sufficient to permit the jury to reasonably conclude that an employee's insistence on following company policy and completing a report before determining what plaintiff had ingested and the appropriate first aid was related to plaintiff's injuries. Plaintiff's testimony was competent to address whether her emotional injuries were related to the willful and wanton conduct.

**3. Damages and Remedies— punitive damages—motion for new trial**

The trial court did not err by denying defendant's motion for a new trial because the facts support the jury's punitive damages award in light of the factors set out in N.C.G.S. § 1D-35(2) and in *BMW*, 517 U.S. 559 (1996).

Appeal by defendant from judgment entered 15 April 2008 and order entered 3 June 2008 by Judge William Z. Wood, Jr. in Forsyth County Superior Court. Heard in the Court of Appeals 23 April 2009.

*Morrow Alexander Porter & Whitley, PLLC, by John Carl Vermitsky, for plaintiff-appellee.*

*Robinson, Bradshaw & Hinson, P.A., by D. Blaine Sanders and Andrew W. J. Tarr, for defendant-appellant.*

GEER, Judge.

Defendant O'Charley's Inc. appeals from a judgment entered following a bifurcated trial in which plaintiff Katherine Hanna Everhart was awarded $10,000.00 in compensatory damages in the first phase of the trial and $350,000.00 in punitive damages in the second phase. The trial court subsequently reduced the punitive damages award to $250,000.00. On appeal, O'Charley's only challenges the punitive damages award, arguing that the trial court erred in denying its motion for judgment notwithstanding the verdict ("JNOV") and its motion for a new trial as to the punitive damages phase. The primary contention of O'Charley's is that its JNOV motion should have been granted for insufficient evidence that Ms. Everhart's injuries were related to willful or wanton conduct attributable to O'Charley's. Because our review of the record reveals ample evidence to support the jury's verdict, and we find O'Charley's' remaining arguments unpersuasive, we uphold the punitive damages award.

## Facts

On 9 September 2006, Ms. Everhart went shopping with her husband and two sons at Hanes Mall in Winston-Salem, North Carolina. After finishing their shopping, the family went to an O'Charley's restaurant near the mall for dinner. Ms. Everhart requested water, immediately drank the entire glass, and asked for a refill. The Everharts' server, Dathan Jones, went to get a water pitcher, but accidentally grabbed a pitcher that had been used to soak soda nozzles in a cleaning solution called Auto-Chlor System Solution-QA Sanitizer ("Auto-Chlor"). As a result, he refilled Ms. Everhart's glass with a mixture of water and Auto-Chlor.

Ms. Everhart took several sips through her straw and immediately noticed an unfamiliar taste and a chemical smell. Although she swallowed some of the liquid, she spit out the rest. Some drops landed on her shirt and immediately began discoloring it. Mr. Everhart asked his wife what was wrong, and she responded: "I've been poisoned." At this point, Mr. Jones came back to the table, grabbed the glass, and left. Ms. Everhart told her husband that she felt sick, "like [she was] going to throw up," and went to the bathroom to try to make herself throw up.

While Ms. Everhart was in the bathroom, Assistant Dining Room Manager Byron Witherspoon came to the table and introduced himself as the manager on duty at O'Charley's. Mr. Everhart told Mr. Witherspoon that "his wife had drunk an unknown substance and she had gotten sick and ran into the restroom." Mr. Witherspoon then left the table, got a "Customer Accident/Incident Report" form from the restaurant office, and went back to the table to obtain information from Mr. Everhart about the incident. While Mr. Witherspoon was asking Mr. Everhart the questions on the incident report form, Mr. Everhart repeatedly asked him, "What was in the pitcher?" Mr. Everhart explained to Mr. Witherspoon that he was taking Ms. Everhart to the emergency room and needed to know what Ms. Everhart had swallowed. Mr. Witherspoon did not answer Mr. Everhart's questions, but instead responded by simply asking the next question on the incident report form.

The container of Auto-Chlor was kept above a sink in the restaurant's kitchen area. Its first aid label stated that if someone swallowed the solution, poison control or a doctor should be called immediately. It also warned that if the solution was ingested, the person *should not* try to induce vomiting unless directed to do so by poison

EVERHART v. O'CHARLEY'S INC.

[200 N.C. App. 142 (2009)]

control or a doctor. According to the label, the person should instead try to sip a glass of water if the person was able to swallow.

After attempting to induce vomiting for roughly five minutes in the bathroom, Ms. Everhart returned to the table where Mr. Witherspoon was still attempting to complete the incident report form by questioning Mr. Everhart. Ms. Everhart was "visibly crying, shaking and extremely upset." Mr. Jones then returned to the table and apologized to Ms. Everhart. Mr. Witherspoon did not, however, ask Mr. Jones any questions about what the substance was that was in Ms. Everhart's glass. In addition, at no time while the Everharts were still at the restaurant did Mr. Witherspoon look for the Auto-Chlor's warning label to give the Everharts the first aid instructions.

The Everharts left O'Charley's to go to Forsyth Medical Center's emergency room. Ms. Everhart testified that on the drive there, she was "distraught" and "petrified" by the fear of not knowing what she had ingested. When she arrived at the hospital, she was unable to tell the medical staff what she drank, but she said she thought it might have been bleach. The doctor treating Ms. Everhart had to call O'Charley's to find out what was in the glass.

Ms. Everhart was discharged after being treated. Beginning the next day and continuing for roughly a week, Ms. Everhart had sores on her lips and in her mouth, had a sore throat, and felt nauseous. Ms. Everhart also experienced painful heartburn, indigestion, and reflux. Two months afterward, Ms. Everhart underwent an endoscopy, which indicated that Ms. Everhart's esophagus, stomach, and duodenum were normal.

Ms. Everhart filed suit against O'Charley's on 12 March 2007, asserting claims for negligence and breach of the implied warranty of merchantability and seeking both compensatory and punitive damages. After the trial court denied O'Charley's' motion for summary judgment, O'Charley's moved pursuant to N.C. Gen. Stat. § 1D-30 (2007) for a bifurcated trial on the issues of compensatory and punitive damages.

Following the compensatory damages phase of the trial, the jury awarded Ms. Everhart $10,000.00. During the punitive damages phase, the trial court denied O'Charley's' motion for a directed verdict at the close of all the evidence. The jury subsequently awarded Ms. Everhart $350,000.00 in punitive damages. The trial court entered judgment on the verdicts on 15 April 2008, but reduced the amount of

the punitive damages award to $250,000.00 pursuant to N.C. Gen. Stat. § 1D-25(b) (2007). On 17 April 2008, O'Charley's moved for JNOV, or, alternatively, for a new trial, with both motions only addressing the punitive damages award. In an order entered 3 June 2008, the trial court denied the motions and upheld the punitive damages award. O'Charley's timely appealed to this Court.

I

[1] O'Charley's contends that the trial court erred during the punitive damages phase of the trial by admitting evidence about allegations in a 2004 Florida lawsuit that a customer had been served bleach in another O'Charley's restaurant. Prior to trial, O'Charley's filed a motion *in limine* to exclude any evidence regarding the Florida lawsuit on the grounds of hearsay, relevance, improper purpose, and unfair prejudice. After considering arguments from counsel, the trial court granted the motion and excluded the evidence.

During the cross-examination of Kevin Alexander, a regional operations director with O'Charley's who was called as an adverse witness by Ms. Everhart, defense counsel asked about the incident report form completed in this case:

Q. After this incident, was it reported to other stores?

A. Yes.

Q. Why was that?

A. I reported it to all of my stores, the incident that had happened, reminded everyone that following the procedures on breaking down the stations, on how we store things. And I again spoke to my boss about it. The following Monday on his conference call he had me to relate what I knew at the time about it to the other operations directors so that it could be—you know, they could talk to their own restaurants about it.

At this point, Ms. Everhart's counsel asked to be heard outside the presence of the jury and argued:

[Defense counsel] just opened the door wide open for me to inquire as to why they inquired with any other restaurants as to this previous incident and gave them any notice of it for future conduct. It's not fair that they get to say, "After this happened I told every other store so this won't happen again," and I can't say, "Well, the first time it happened, you didn't tell anyone."

The trial court ruled that "[t]he jury gets to consider similar past conduct" and allowed Ms. Everhart's counsel to ask Mr. Alexander on redirect, over O'Charley's' objection, "Mr. Alexander, are you aware of the existence of any similar past conduct of the nature of this lawsuit by O'Charley's in 2002 in Florida?" Mr. Alexander responded that he "became aware of an allegation today· . . . I just found out today that there was an allegation of bleach."

O'Charley's first claims that the evidence is inadmissible because Mr. Alexander did not know about the allegations prior to being questioned, and, therefore, could not testify from personal knowledge as required by Rule 602 of the Rules of Evidence. O'Charley's· did not, however, assert Rule 602 as a basis for its objection to the question asked Mr. Alexander. Its objection on other bases—hearsay, relevance, and unfair prejudice—were not sufficient to preserve an appeal based on Rule 602. A party may not assert at trial one basis for objection to the admission of evidence, but then rely upon a different basis on appeal. *See State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988) ("[Appellant] may not swap horses after trial in order to obtain a thoroughbred upon appeal.").

While O'Charley's did rely in part upon Rule 602 in its motion *in limine* that was granted by the trial court, in order to preserve the issue for appeal, it was required to repeat its objections at trial when the evidence was actually offered. *See State v. Tutt*, 171 N.C. App. 518, 520, 615 S.E.2d 688, 690 (2005) ("Rulings on motions *in limine* are preliminary in nature and subject to change at trial, depending on the evidence offered, and thus an objection to an order granting or denying the motion is insufficient to preserve for appeal the question of the admissibility of the evidence." (internal quotation marks omitted)). We, therefore, do not consider this argument on appeal.

O'Charley's next contends that the evidence of the Florida allegations was inadmissible hearsay. As Ms. Everhart's counsel argued, however, defense counsel "opened the door" for Ms. Everhart's counsel to question Mr. Alexander about the Florida case.

It is well established that "where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence would be incompetent or irrelevant had it been offered initially." *State v. Sexton*, 336 N.C. 321, 360, 444 S.E.2d 879, 901, *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429, 115 S. Ct. 525 (1994). Further, "evidence which would otherwise be inadmissible may be permissible

on cross-examination to correct inaccuracies or misleading omissions in the [party]'s testimony or to dispel favorable inferences arising therefrom." *State v. Braxton*, 352 N.C. 158, 193, 531 S.E.2d 428, 448 (2000) (internal quotation marks omitted), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797, 121 S. Ct. 890 (2001). *Accord State v. Johnston*, 344 N.C. 596, 608, 476 S.E.2d 289, 296 (1996) (holding that "the introduction of evidence to dispel favorable inferences arising from [the] cross-examination of a witness" is permissible even if the evidence would otherwise constitute hearsay); *State v. Lynch*, 334 N.C. 402, 412, 432 S.E.2d 349, 354 (1993) (observing that when party "opens the door" to issue, opposing party may elicit evidence that would otherwise be incompetent or irrelevant to "dispel favorable inferences arising" from party's evidence).

The testimony elicited by O'Charley's' counsel when questioning Mr. Alexander would have permitted the jury to draw the favorable inference that once O'Charley's had notice of an incident, it would take corrective measures to ensure that such an incident would not happen again, thus negating the need to impose punitive damages to deter further misconduct. Ms. Everhart was entitled to attempt to rebut this inference by showing that O'Charley's, when it received notice of similar allegations on a prior occasion, did not advise its regional operations directors of those allegations. *See Braxton*, 352 N.C. at 193-94, 531 S.E.2d at 449 (concluding State could cross-examine defendant regarding specifics of prior offenses where defendant's testimony attempted to minimize seriousness of crimes). The trial court, therefore, properly permitted the question.

O'Charley's also argues that the evidence should have been excluded under N.C.R. Evid. 403 as being unfairly prejudicial. Where, however, a party is responsible for "opening the door" with respect to certain evidence, that party may not complain of unfair prejudice resulting from its admission. *See State v. Wilson*, 151 N.C. App. 219, 226, 565 S.E.2d 223, 228 ("Because defendant opened the door to the testimony at issue, we need not address defendant's argument that the testimony was inadmissible because it was irrelevant or overly prejudicial."), *cert. denied*, 356 N.C. 313, 571 S.E.2d 215 (2002). This argument is, therefore, also overruled.

## II

[2] O'Charley's next argues that the trial court erred in denying its motion for JNOV. "The standard of review of a ruling entered upon a motion for judgment notwithstanding the verdict is 'whether, upon

examination of all the evidence in the light most favorable to the non-moving party, and that party being given the benefit of every reasonable inference drawn therefrom, the evidence is sufficient to be submitted to the jury.' " *Branch v. High Rock Realty, Inc.*, 151 N.C. App. 244, 249-50, 565 S.E.2d 248, 252 (2002) (quoting *Fulk v. Piedmont Music Ctr.*, 138 N.C. App. 425, 429, 531 S.E.2d 476, 479 (2000)), *disc. review denied*, 356 N.C. 667, 576 S.E.2d 330 (2003). A JNOV "motion should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim." *Norman Owen Trucking, Inc. v. Morkoski*, 131 N.C. App. 168, 172, 506 S.E.2d 267, 270 (1998). A " 'scintilla of evidence' " is defined as " 'very slight evidence.' " *Scarborough v. Dillard's Inc.*, 188 N.C. App. 430, 434, 655 S.E.2d 875, 878 (2008) (quoting *State v. Lawrence*, 196 N.C. 562, 582, 146 S.E. 395, 405 (1929)).

N.C. Gen. Stat. § 1D-15(a) (2007) establishes the standards for recovering punitive damages in North Carolina:

Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:

(1) Fraud.

(2) Malice.

(3) Willful or wanton conduct.

The existence of the aggravating factor must be proven by clear and convincing evidence. N.C. Gen. Stat. § 1D-15(b).

In this case, the sole aggravating factor at issue at trial was willful or wanton conduct. N.C. Gen. Stat. § 1D-5(7) (2007) defines "[w]illful or wanton conduct" as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. 'Willful or wanton conduct' means more than gross negligence."

O'Charley's first challenges the sufficiency of the evidence of willful or wanton conduct. In arguing that Mr. Witherspoon's conduct was not willful or wanton, however, O'Charley's only points to the evidence favorable to its position. It ignores the evidence indicating that Mr. Witherspoon, consistent with O'Charley's' policy, willfully

disregarded the possibility of injury to Ms. Everhart so that he could complete the incident report form.

Ms. Everhart presented evidence that after Ms. Everhart went into the restroom to try to induce vomiting and Mr. Witherspoon came to the Everharts' table to fill out the incident report form, Mr. Everhart repeatedly asked Mr. Witherspoon, "What was in the pitcher?" Mr. Witherspoon "just ignored his question and went on with his sheet of paper." Mr. Everhart testified that Mr. Witherspoon refused to look up from the form and continued to ask questions from the form despite Mr. Everhart's attempts to try to find out what was in Ms. Everhart's glass. Ms. Everhart's evidence showed that Mr. Witherspoon made no effort to identify what had been served Ms. Everhart even though he could have asked the server when he returned to the table.

The label on the Auto-Chlor, which was back in the restaurant's kitchen, contained a first aid warning stating: "IF SWALLOWED: Call poison control center or doctor immediately for treatment advice. Have person sip a glass of water if able to swallow. *Do not induce vomiting unless told to do so by a poison control center or doctor.* . . . NOTE TO PHYSICIAN: Probable mucosal damage may contraindicate the use of gastric lavage. Measures against circulatory shock, respiratory depression and convulsion may be needed." (Emphasis added.) It is undisputed that Mr. Witherspoon did not attempt to find the Auto-Chlor warning label to learn what its first aid instructions were.

Mr. Witherspoon testified that he did not answer Mr. Everhart's questions because he needed to collect "vital information" such as Ms. Everhart's age, marital status, and contact information for the incident report before investigating the nature of the substance Ms. Everhart had ingested. Mr. Witherspoon also acknowledged that although he knew Ms. Everhart was in the bathroom, he did not instruct anyone to go check on her because he needed to fill out the report form. Both Mr. Witherspoon and Kevin Alexander, one of O'Charley's' regional operations directors, testified that O'Charley's has a policy that the manager must complete the incident report form before doing anything else unless the customer is "convulsing, passed out on the floor," or "bleeding profusely." Mr. Witherspoon acted in accordance with the policy. Because, according to Mr. Witherspoon, Ms. Everhart did not look "overly sick" when she returned from the bathroom, Mr. Witherspoon continued to fill out the report form.

Although the incident report form asks for biographical information, such as the name, address, telephone number, and employer of the injured person, the form does not include space for documenting the results of any investigation by O'Charley's personnel. The form states that it is to be "completed by O'Charley's, Inc. personnel in anticipation of litigation[,]" and asks, "Do you think a claim will be made?" It also asks for the contact information for potential "witnesses."

This evidence, viewed in the light most favorable to Ms. Everhart, shows that, although Mr. Witherspoon knew Ms. Everhart had ingested some unknown substance that had made her sick, he refused to find out what she had actually been served or the first aid protocol for that substance before completing O'Charley's' incident report form. Moreover, that form is not designed to provide assistance to the customer, but is focused on "anticipat[ing] . . . litigation." A jury could reasonably find from this evidence that Mr. Witherspoon chose to give preference to protecting O'Charley's from possible litigation over providing assistance to Ms. Everhart who had been served a possibly toxic substance. The jury could then further conclude that Mr. Witherspoon acted with conscious and intentional disregard of and indifference to Ms. Everhart's rights and safety, thus supporting a finding of willful or wanton conduct. *See Scarborough*, 188 N.C. App. at 435, 655 S.E.2d at 878-79 (holding there was sufficient evidence of "conscious and intentional disregard" of employee's rights where employer failed to fully investigate incident before charging employee with embezzlement). *See also Medeiros v. Randolph County Hosp. Ass'n*, 968 F. Supp. 1469, 1475 (M.D. Ala. 1997) (concluding evidence was sufficient to send punitive damages issue to jury under § 1983 where evidence showed that hospital "failed to provide even the most basic pre-termination" investigation and hearing prior to terminating doctor's medical privileges).

O'Charley's compares this case to *Faris v. SFX Entm't, Inc.*, 2006 U.S. Dist. LEXIS 89918, 2006 WL 3690632 (W.D.N.C. 2006) (unpublished), *Collins v. St. George Physical Therapy*, 141 N.C. App. 82, 539 S.E.2d 356 (2000), and *Butt v. Goforth Props., Inc.*, 95 N.C. App. 615, 383 S.E.2d 387 (1989), and contends that these cases "illustrate[] the type of conduct that fails to meet the willful or wanton threshold." In *Faris*, a concert attendee at an amphitheater was electrocuted in a stairwell when he accidentally came into contact with a broken light fixture while holding onto the handrail, thus completing the circuit with the stairwell. 2006 U.S. Dist. LEXIS 89918 at *4, 2006 WL 3690632

at *1. One week earlier, two other people had reported being shocked at the same location from the same faulty light fixture. *Id.* at *4, 2006 WL 3690632 at *2. The district court concluded as a matter of law that the facility manager's conduct in failing to correct the condition was not willful and wanton, reasoning that: "a reading of the facts in a light most favorable to the plaintiff does not produce evidence that Lynch intentionally turned a blind eye to the danger: he looked, he saw, and he acted. Unfortunately, and possibly negligently, he looked in the wrong place, saw the wrong thing, and took ineffective action." *Id.* at *23-24, 2006 WL 3690632 at *7.

Here, the evidence would permit the jury to make the finding of an intentional blind eye to danger that was absent in *Faris*. Mr. Witherspoon did not "ineffective[ly]" attempt to help Ms. Everhart, but rather willfully avoided assisting her in order to complete O'Charley's' litigation form.

Mr. Witherspoon's deliberate disregard of Ms. Everhart's safety in favor of preparing for litigation similarly distinguishes this case from *Collins* and *Butt*. The evidence in those two cases showed, at best, that the defendant was seriously negligent and the plaintiff was harmed. Neither case had the evidence of willfulness produced in this case. *See Collins*, 141 N.C. App. at 86-88, 539 S.E.2d at 360-61 (holding there was insufficient evidence of willful or wanton conduct where physical therapist repaired weight machine without training and with improper parts, and plaintiff was injured when machine broke); *Butt*, 95 N.C. App. at 619, 383 S.E.2d at 389 ("In the case at bar, plaintiffs submitted affidavits which stated that defendants' employees were extremely careless and that they exercised poor judgment."). We, therefore, hold that Ms. Everhart presented sufficient evidence of willful and wanton conduct to send the punitive damages issue to the jury.

O'Charley's next contends that it cannot be held liable for punitive damages under N.C. Gen. Stat. § 1D-15(c). That statute provides that in order to award punitive damages against a corporation based on vicarious liability, "the officers, directors, or managers of the corporation [must have] participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." N.C. Gen. Stat. § 1D-15(c).

This is not, however, a case where O'Charley's' liability for punitive damages was based solely on vicarious liability. Mr. Witherspoon testified that in his interaction with the Everharts, he was simply fol-

lowing O'Charley's' corporate policy of completing the incident report form before investigating the nature of the incident. O'Charley's' regional operations director confirmed that this was O'Charley's' policy. A corporation may be subject to punitive damages based on a theory of direct liability where the corporation's acts or policies constitute the aggravating factor. *See Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158, 1159-61 (Fla. 1995) (differentiating between punitive damages based on vicarious liability and direct liability of corporation for punitive damages).

O'Charley's argues that its policy does not amount to willful or wanton conduct. O'Charley's, however, cites no authority supportive of its position. Instead, O'Charley's claims that "there is nothing 'wicked' or 'needless' about preparing a report that memorializes the facts of an incident that may be the subject of litigation." This characterization of the O'Charley's policy fails to apply N.C. Gen. Stat. § 1D-5(7)'s definition of "willful or wanton conduct."

After describing its policy in the light most favorable to it—contrary to the proper standard of review—O'Charley's asserts that "[it] puts the safety of its guests before the legitimate need to memorialize the facts surrounding the incident." Mr. Witherspoon, however, testified that it was O'Charley's' corporate policy to complete the incident report form before investigating an incident unless the customer is "convulsing, passed out on the floor," or "bleeding profusely." A reasonable jury could disagree with O'Charley's' characterization of its policy and conclude to the contrary that this policy recklessly disregards customers' safety and well-being in order to begin the process of protecting O'Charley's against potential litigation.

In any event, we disagree with O'Charley's' contention, as to Mr. Witherspoon, that even if he did act willfully or wantonly, he does not fall within the category of employees—officers, directors, and managers—whose conduct may be imputed to O'Charley's for purposes of punitive damages. There is no suggestion that Mr. Witherspoon is an officer or director of O'Charley's; the issue under N.C. Gen. Stat. § 1D-15(c) is whether he is a manager. In the absence of a statutory definition, this Court has defined "[a] 'manager' [as] one who 'conducts, directs, or supervises something.'" *Miller v. B.H.B. Enters., Inc.*, 152 N.C. App. 532, 539-40, 568 S.E.2d 219, 225 (2002) (quoting *Webster's Third New International Dictionary* 1372 (1968)).

In *Wallace v. M, M & R, Inc.*, 165 N.C. App. 827, 833, 600 S.E.2d 514, 518 (2004), this Court addressed whether an employee of the

defendants' nightclub was a manager within the meaning of N.C. Gen. Stat. § 1D-15(c). In concluding that the employee was in fact a manager, the Court found significant the fact that: (1) the employee was designated a manager; (2) the employee had supervisory powers; (3) the employee gave input on hiring and firing decisions and participated in personnel meetings; (4) the employee set work schedules for other employees; and (5) the employee handled money and controlled dispensing alcohol. *Id.*

In this case, Mr. Witherspoon's title at the time of the incident was Assistant Dining Room Manager, and he introduced himself as the "manager in charge" when he first came over to the Everharts' table. Renaldo Famble, the restaurant's Service Manager and Mr. Witherspoon's boss, testified that "every assistant manager is responsible for the restaurant." O'Charley's' regional operations director further testified that in Mr. Witherspoon's position, he "direct[ed] what is going on on the shift," including authorizing customer refunds, comping meals, and coordinating other employees' breaks. Mr. Witherspoon also gave input on "decid[ing] who is hired and who is fired[.]" Based on *Wallace*, we conclude that there is sufficient evidence that Mr. Witherspoon was a "manager" of O'Charley's for punitive damages purposes. *See also Miller*, 152 N.C. App. at 539-40, 568 S.E.2d at 225 (holding employee was manager where employee had supervisory powers, including power to hire and fire employees, and worked "directly under" and "hand-in-hand" with owner of restaurant).

Finally, O'Charley's argues that Ms. Everhart failed to produce sufficient evidence that the willful and wanton conduct, if any, was related to Ms. Everhart's injuries. N.C. Gen. Stat. § 1D-15(a) requires that the fraud, malice, or willful or wanton conduct be "*related to* the injury for which compensatory damages were awarded[.]" (Emphasis added.) Citing to medical causation cases, O'Charley's asserts that Ms. Everhart was required to present evidence of a causal connection between Mr. Witherspoon's conduct and Ms. Everhart's injuries.

O'Charley's' argument, however, overlooks the fact that the statute is not phrased in terms of causation, but instead uses the phrase "related to." *Id.* Where, as here, "a statute does not define a term, we must rely on the common and ordinary meaning of the words used." *Martin v. N.C. Dep't of Health & Human Servs.*, 194 N.C. App. 716, 722, 670 S.E.2d 629, 634 (2009), *disc. review denied*, 363 N.C. 374, 678 S.E.2d 665 (2009). The term "related" is defined as

"having a relationship" or "connected by reason of an established or discoverable relation." *Webster's Third New International Dictionary* 1916 (1968). *See State v. Abshire*, 363 N.C. 322, 329, 677 S.E.2d 444, 449-50 (2009) (using dictionary definition to determine ordinary meaning of word in statute where statute did not define term). This definition does not denote a causal connection, and, therefore, we cannot import a causation requirement into the statute. *See State v. Hardy*, 67 N.C. App. 122, 125, 312 S.E.2d 699, 702 (1984) (holding that unambiguous statutes "must be construed as written" and courts are "without power to interpolate or to superimpose provisions not contained therein").

Indeed, this Court, in addressing the necessary relationship between the defendant's aggravating conduct and the plaintiff's injuries, has previously held that the language of N.C. Gen. Stat. § 1D-15(c) requires only that a plaintiff demonstrate a *"connection* between the [aggravating conduct] and plaintiff['s] alleged harm." *Schenk v. HNA Holdings, Inc.*, 170 N.C. App. 555, 560-61, 613 S.E.2d 503, 508, *disc. review denied*, 360 N.C. 177, 626 S.E.2d 649 (2005) (emphasis added). Thus, contrary to O'Charley's' argument, Ms. Everhart was not required to prove that the willful and wanton conduct caused Ms. Everhart's injuries, but rather was required to prove a connection between that conduct and her injuries.

We hold Ms. Everhart presented sufficient evidence of the necessary "connection." The Auto-Chlor warning label stated that if someone ingested the solution, poison control or a doctor should be contacted immediately and the person should not attempt to induce vomiting unless directed to do so by poison control or the doctor. The label also indicated that the person should try to sip water if possible. Because Mr. Witherspoon was following the O'Charley's policy, he never attempted to find out if Ms. Everhart had ingested Auto-Chlor and never read the label to learn what first aid steps were necessary to treat ingestion of Auto-Chlor. Despite the fact that the solution's warning label explicitly instructed not to induce vomiting and to try to drink water if possible, Ms. Everhart testified that she was in the bathroom for approximately five minutes trying to make herself throw up. Ms. Everhart was never told to try to sip water and she testified that she had blisters and sores on her lips and in her mouth, had a sore throat, and experienced nausea, heartburn, indigestion, and reflux for a week afterward. This evidence was sufficient to show a connection between the failure to investigate what Ms. Everhart drank and her injuries.

EVERHART v. O'CHARLEY'S INC.

[200 N.C. App. 142 (2009)]

In addition to her physical injuries, Ms. Everhart also testified about her emotional distress while driving to the hospital:

> We had no information at all, just my having tasted it and what I had spat out had already bleached out my shirt—I mean, in that short a period of time. And I was scared because I felt like if this liquid had done this to my shirt that quickly, what is it doing to my insides[?] I mean, I was just petrified. I didn't know what was going on inside.

A jury could also find a connection between this evidence of Ms. Everhart's emotional injuries and Mr. Witherspoon's deliberate disregard of the need to obtain information regarding what Ms. Everhart had swallowed.

O'Charley's also urges that expert evidence was required to prove the necessary relationship, but relies on authority addressing causation and not a "connection" or "related[ness]." The actual issue set out in N.C. Gen. Stat. § 1D-15(c) does not, in this case, require expert evidence. *See Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980) (recognizing that expert evidence is not necessary to prove causation in the " 'many instances in which the facts in evidence are such that any layman of average intelligence and experience would know what caused the injuries complained of' " (quoting *Gillikin v. Burbage*, 263 N.C. 317, 325, 139 S.E.2d 753, 760 (1965))).

With respect to Ms. Everhart's emotional distress, contrary to O'Charley's' contention, this Court has held that even in cases involving intentional or negligent infliction of emotional distress, expert medical evidence is not necessarily required. *See Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 450, 579 S.E.2d 505, 508 (2003) (holding that "[p]roof of 'severe emotional distress' does not necessarily require medical evidence or testimony"); *McKnight v. Simpson's Beauty Supply, Inc.*, 86 N.C. App. 451, 454, 358 S.E.2d 107, 109 (1987) (concluding trial court erred in dismissing claim for intentional infliction of emotional distress for lack of expert evidence because "[t]hough expert medical testimony may be necessary to establish that some types of emotional distress were suffered or that it was caused by a defendant's outrageous conduct, such testimony was not indispensable to a jury trial on plaintiff's claim"). We hold that, under the circumstances of this case, Ms. Everhart's testimony was competent to address whether her emotional injuries were related to the willful and wanton conduct.

Thus, we conclude that the evidence at trial, viewed in the light most favorable to Ms. Everhart, was sufficient to permit the jury to reasonably conclude that Mr. Witherspoon's refusal, pursuant to corporate policy, to find out what Ms. Everhart had ingested and learn what first aid was necessary is "related" to Ms. Everhart's injuries. We conclude, therefore, that the trial court did not err in denying O'Charley's' motion for JNOV as to the punitive damages verdict.

### III

[3] O'Charley's also argues that the trial court should have granted its motion for a new trial. It claims (1) that the punitive damages award was "grossly excessive" and violated its due process rights and (2) the jury manifestly disregarded the trial court's instructions in calculating the amount of punitive damages to award.

N.C. Gen. Stat. § 1D-25(b) provides that "[p]unitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater." The statute further states that "[i]f a trier of fact returns a verdict for punitive damages in excess of the maximum amount specified under this subsection, the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount." *Id.* Here, as the jury awarded Ms. Everhart $10,000.00 in compensatory damages, the trial court reduced the jury's punitive damages award of $350,000.00 to $250,000.00 in accordance with N.C. Gen. Stat. § 1D-25(b).

Whether a punitive damages award is unconstitutionally excessive is a question of law reviewed de novo on appeal. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 149 L. Ed. 2d 674, 687, 121 S. Ct. 1678, 1682-83 (2001) ("[C]ourts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards."). O'Charley's contends that "the punitive damages award can only be described as grossly excessive and arbitrary[,]" because "[e]ven with the Court's statutory reduction of the award from $350,000 to $250,000, [O'Charley's] faces an award that is 25 times the amount of the compensatory damages."

When a punitive damages award is "grossly excessive," it violates the due process clause of the Fourteenth Amendment. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 134 L. Ed. 2d 809, 822, 116 S. Ct. 1589, 1596 (1996). The *BMW* Court set out three "guideposts" for evaluating whether a punitive damages award is grossly excessive: (1) the

degree of reprehensibility of the defendant's conduct; (2) the disparity between the compensatory and punitive damages awards; and (3) available sanctions for comparable conduct. *Id.* at 574-75, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598-99.

This Court applied the *BMW* factors in *Rhyne v. K-Mart Corp.*, 149 N.C. App. 672, 562 S.E.2d 82 (2002), *aff'd on other grounds*, 358 N.C. 160, 594 S.E.2d 1 (2004).[1] In *Rhyne*, 149 N.C. App. at 689, 562 S.E.2d at 94, the evidence showed that one of the defendant's employees attacked Mr. Rhyne, putting him in a chokehold for several minutes, while another employee pushed Mrs. Rhyne to the ground and prevented her from helping her husband. The defendant also took out assault charges against Mr. Rhyne in an attempt to prevent them from pressing charges against defendant's employees. *Id.* At trial, the jury awarded Mr. Rhyne $8,255.00 and Mrs. Rhyne $10,730.00 in compensatory damages. *Id.* at 676, 562 S.E.2d at 87. The jury further awarded the Rhynes $11.5 million each in punitive damages. *Id.* As in this case, the trial court reduced the punitive damages award to $250,000.00 each under N.C. Gen. Stat. § 1D-25. *Rhyne*, 149 N.C. App. at 676, 562 S.E.2d at 87.

In holding that the punitive damage awards were not unconstitutionally excessive, this Court, considering the first *BMW* factor, emphasized the violent nature of the defendant's employees' conduct and that it went beyond mere negligence. *Id.* at 689, 562 S.E.2d at 94. With respect to the second factor, the Court considered the ratios of the punitive damages to the compensatory damages—"30 to 1 for Mr. Rhyne and 23 to 1 for Mrs. Rhyne"—to be "relatively low." *Id.* As for the third *BMW* factor, the Court declined to consider the punitive damages award excessive in light of the General Assembly's judgment concerning appropriate sanctions for the conduct at issue. *Id.*

As in *Rhyne*, we conclude that application of the *BMW* factors to the facts of this case similarly establishes that the punitive damages award is not unconstitutionally excessive. As for the reprehensibility of O'Charley's' conduct, the first *BMW* factor, the evidence tends to show that Mr. Witherspoon knew that Ms. Everhart had drunk some unknown substance that had made her ill, but he consciously chose not to identify what had actually been served to her or to determine the recommended first aid protocol until after she had already gone to the hospital. Instead, Mr. Witherspoon, consistent with the

---

1. In affirming this Court's decision, the Supreme Court upheld the constitutionality of N.C. Gen. Stat. § 1D-25, but did not address whether the amount of punitive damages awarded in the case was unconstitutionally excessive.

## EVERHART v. O'CHARLEY'S INC.

[200 N.C. App. 142 (2009)]

O'Charley's' policy, focused on completing an incident report form used to anticipate litigation against O'Charley's, ignoring Mr. Everhart's concerns about his wife's safety. O'Charley's' policy, as followed by Mr. Witherspoon—which places priority on protecting O'Charley's against civil liability over first aid for customers unless the customer is "convulsing, passed out on the floor," or "bleeding profusely"—rises to the level of reprehensible conduct.

As for the second *BMW* factor, the ratio of Ms. Everhart's punitive damages to compensatory damages—$250,000 to $10,000 = 25:1—falls within the same range as the plaintiffs' awards in *Rhyne* that this Court held was "relatively low." *Id.* Accordingly, based on *Rhyne*, we hold that the ratio in this case is not unconstitutionally excessive under *BMW. See also TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462, 125 L. Ed. 2d 366, 382, 113 S. Ct. 2711, 2723 (1993) (concluding that punitive damages award 526 times amount of actual damages was "certainly large" but not "so 'grossly excessive' as to be beyond the power of the State to allow").

The third *BMW* "guidepost" requires consideration of civil or criminal penalties that could be imposed for comparable misconduct, giving " ' "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.' " *Rhyne*, 149 N.C. App. at 688-89, 562 S.E.2d at 94 (quoting *BMW*, 517 U.S. at 584, 134 L. Ed. 2d at 832, 116 S. Ct. at 1603). N.C. Gen. Stat. § 106-129 (2007), the only statute cited by O'Charley's, prohibits the adulteration of food. N.C. Gen. Stat. § 106-124.1(a) (2007) imposes a maximum civil penalty of $2,000.00 for violating N.C. Gen. Stat. § 106-129. O'Charley's views the "gross disparity between the punitive damages award here and the only comparable civil penalty [as] yet another indicium of the award's excessiveness."

In addition to the civil penalty, however, N.C. Gen. Stat. § 106-124 makes the violation of N.C. Gen. Stat. § 106-129 a Class 2 misdemeanor. In turn, N.C. Gen. Stat. § 15A-1340.23(c) (2007) provides that the maximum sentence for a Class 2 misdemeanor is 60 days imprisonment. The Supreme Court in *BMW* noted that it had upheld punitive damage awards " 'much in excess of the fine that could be imposed,' " where "imprisonment was also authorized in the criminal context." 517 U.S. at 583, 134 L. Ed. 2d at 831, 116 S. Ct. at 1603 (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23, 113 L. Ed. 2d 1, 23, 111 S. Ct. 1032, 1046 (1991)). Thus, in cases such as this one, exposure to criminal liability for comparable conduct justifies a larger punitive-to-compensatory damages ratio. Ultimately, in light of

the reprehensibility of O'Charley's' conduct, the relatively low ratio of punitive damages to compensatory damages, and the civil and criminal sanctions that might have been imposed for similar conduct, we conclude that the trial court did not err in determining that the punitive damages award in this case does not violate O'Charley's' due process rights.

O'Charley's argues that, in any event, the trial court should have granted its motion for a new trial under Rule 59(a)(5) ("[m]anifest disregard by the jury of the instructions of the court"), Rule 59(a)(6) ("[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice"), and Rule 59(a)(7) ("[i]nsufficiency of the evidence to justify the verdict or that the verdict is contrary to law"). Denial of a motion for a new trial pursuant to N.C.R. Civ. P. 59(a)(5) and (6) is reviewed for an abuse of discretion, while the sufficiency of the evidence to justify the verdict is reviewed under a de novo standard. *N.C. Indus. Capital, LLC v. Clayton,* 185 N.C. App. 356, 371, 649 S.E.2d 14, 25 (2007).

Turning first to the sufficiency of the evidence, N.C. Gen. Stat. § 1D-35 (2007) provides that in determining the amount of punitive damages, the trier of fact "[m]ay consider only that evidence that relates" to: (1) "[t]he reprehensibility of the defendant's motives and conduct"; (2) "[t]he likelihood, at the relevant time, of serious harm"; (3) "[t]he degree of the defendant's awareness of the probable consequences of its conduct"; (4) "[t]he duration of the defendant's conduct"; (5) "[t]he actual damages suffered by the claimant"; (6) "[a]ny concealment by the defendant of the facts or consequences of its conduct"; (7) "[t]he existence and frequency of any similar past conduct by the defendant"; (8) "[w]hether the defendant profited from the conduct"; and (9) "[t]he defendant's ability to pay punitive damages, as evidenced by its revenues or net worth." N.C. Gen. Stat. § 1D-35(2)(a)-(i). Without specifically citing to any factor, defendant argues that there is a "paucity of evidence supporting the jury's excessive award."

In concluding that the punitive damages award was "justified," the trial court found, based on the evidence presented, (1) that after drinking the Auto-Chlor mixture, Ms. Everhart believed she had ingested "poison" and was in great emotional distress while trying to induce vomiting in the bathroom; (2) that in response to the incident Mr. Witherspoon interviewed Mr. Everhart to complete an incident report form, which is used to collect biographical data and other

information in anticipation of litigation; (3) that it was O'Charley's' policy to complete the incident report form before investigating the nature of the chemical unless the customer was "bleeding, passed out, or convulsing on the floor"; (4) that Mr. Witherspoon "refused to respond" to Mr. Everhart's question about whether he knew what Ms. Everhart had been served, "instead only asking the next question on the incident report"; (5) that when Ms. Everhart's server returned to the table, Mr. Witherspoon neither asked the server if he knew what was in the pitcher nor directed the server to find out; and (6) that at no time before Ms. Everhart left for the hospital did "Mr. Witherspoon look for the label of the sanitizing solution to provide to Mr. or Mrs. Everhart instructions on what to do or not to do for her injuries." We agree that the evidence would permit the jury to find these facts and that these facts support the jury's punitive damages award in light of the factors set out in N.C. Gen. Stat. § 1D-35(2). *See Greene v. Royster*, 187 N.C. App. 71, 80, 652 S.E.2d 277, 283 (2007) (holding that trial court's order denying motion for new punitive damages trial contained sufficient findings, "all supported by evidence adduced at trial, in support of its conclusion that the jury's punitive damages verdict was amply supported by the evidence").

O'Charley's next argues that "by implication" from the lack of evidence, "the jury disregarded the Court's instructions, and instead based its verdict on passion and prejudice against [O'Charley's]." In *Greene*, 187 N.C. App. at 81, 652 S.E.2d at 283, however, this Court upheld the denial of a motion for a new trial pursuant to Rule 59(a)(6) where the "defendants offered the trial court no facts which support their argument that the jury acted with passion and prejudice." Similarly, here, O'Charley's points to nothing in the record—except the award itself—that might indicate that the jury disregarded the trial court's instructions or awarded punitive damages under the influence of passion or prejudice. O'Charley's' arguments instead repeat the contentions we found unpersuasive regarding its JNOV motion. As O'Charley's fails to make any separate and distinct arguments in support of its motion for a new trial, we hold that the trial court did not err in denying O'Charley's' motion for a new trial.

No Error.

Judges BRYANT and STEPHENS concur.