Potts v. KEL, LLC, 2021 NCBC 72.

STATE OF NORTH CAROLINA

IREDELL COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 2877

W. AVALON POTTS, derivatively on behalf of Steel Tube, Inc.,

Plaintiff,

v.

KEL, LLC; RIVES & ASSOCIATES, LLP,

Defendants,

and

STEEL TUBE, INC.,

Nominal Defendant,

and

LEON L. RIVES, II,

Defendant/
Counterclaimant/
Third-Party Plaintiff,

v.

AVALON1, LLC,

Third-Party Defendant/
Counterclaimant.

**ORDER AND OPINION ON DEFENDANTS' MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND A NEW TRIAL**

1. After an eight-day trial, a jury returned verdicts awarding compensatory and punitive damages against Leon L. Rives, II and Rives & Associates, LLP. Both have moved for a new trial and for judgment notwithstanding the verdict. For the following reasons, the Court **DENIES** the motions.

*Moore and Van Allen, PLLC, by Mark A. Nebrig, John T. Floyd, and Benjamin E. Shook, for Derivative Plaintiff W. Avalon Potts and for Counterclaimant Avalon1, LLC.*

*Sharpless McClearn Lester Duffy, PA, by Frederick K. Sharpless and Pamela S. Duffy, for Defendants Leon L. Rives, II and Rives & Associates, LLP.*

*No counsel appeared for Defendant KEL, LLC or for Nominal Defendant Steel Tube, Inc.*

Conrad, Judge.

## I.
## BACKGROUND

2. This case arises out of a dispute between the co-owners of Steel Tube, Inc. From early 2015 until early 2017, W. Avalon Potts and Leon L. Rives, II were Steel Tube's only owners, officers, and directors. Claiming to have discovered an extensive scheme of fraud and self-dealing by Rives, Potts filed suit and asserted several derivative claims on Steel Tube's behalf. Potts also named Rives & Associates, LLP—a tax and accounting firm whose managing partner is Rives—as a defendant.

3. Not long after the lawsuit began, Potts ousted Rives from Steel Tube. This was possible because Rives had defaulted on payments that he owed to the original owner of his shares (one of Steel Tube's founders), who retained a security interest in the shares. Potts discovered the default, struck a deal to obtain the security interest, repossessed the shares, and disposed of them in a public sale. Rives objected, prompting the parties to add another set of claims related to the reasonableness of the sale.

4. This litigation has been contentious throughout. At various times, the parties have sought emergency relief, filed both prediscovery and postdiscovery dispositive motions, and pursued two rounds of pretrial motions to exclude evidence. Previous opinions convey much of the procedural history, as well as the allegations

and claims, in more detail. *See Potts v. KEL, LLC* (*Potts I*), 2018 NCBC LEXIS 24 (N.C. Super. Ct. Mar. 27, 2018) (ECF No. 86); *Potts v. KEL, LLC* (*Potts II*), 2019 NCBC LEXIS 30 (N.C. Super. Ct. May 9, 2019) (ECF No. 131); *Potts v. KEL, LLC* (*Potts III*), 2019 NCBC LEXIS 61 (N.C. Super. Ct. Sept. 27, 2019) (ECF No. 151).

5.     The parties tried the surviving claims and issues before a jury over eight days. Below, the Court summarizes the trial evidence, the verdict, and the pending motions.

## A. Evidence at Trial

6.     Steel Tube is a carbon steel and galvanized steel tube manufacturer. Its founders, Potts and Roy Lazenby, began the company in 1990. Each held a fifty percent ownership interest[1] and served as an officer and director for the next twenty-five years. (*See* Joint Stipulation of Facts 2, ECF No. 193 ["Joint Stipulation"]; Trial Test. of Avalon Potts 8:11–14, ECF No. 257.5 ["Potts"]; Trial Test. of Roy Lazenby 4:3–10, ECF No. 257.4 ["Lazenby"].)

7.     Sometime before the events giving rise to this case, Rives & Associates began performing tax and accounting services for Steel Tube. Rives, a certified public accountant, was the firm's managing partner. His father (also named Leon) and his brothers (Kellan and Evan) worked there as well. (*See* Trial Test. of Leon Rives, II 4:23–5:19, 9:12–15, 103:19–104:14, 142:13–143:13, ECF No. 257.6 ["Rives"]; Trial Test. of Janice Hatchell 6:17–7:4, ECF No. 257.3 ["Hatchell"].)

---

[1] Lazenby actually split his shares with his wife. For clarity, the Court refers to Lazenby as the owner of the shares.

8. In late 2014, Rives and a business associate tried to buy Steel Tube. (*See* Rives 12:24–13:3.) Having become familiar with the company's operations and finances, Rives saw profit potential. He knew, for example, that Steel Tube's equipment was essentially debt-free. (*See* Rives 13:17–14:12.) If the price was right, Rives estimated that he and his fellow investor could quadruple their money simply by selling the equipment. (*See* Rives 14:13–16:5.) But Potts and Rives could not settle on terms, and no deal was reached. (*See* Potts 12:11–14; Rives 32:2–11.)

9. As negotiations with Potts faltered, Rives made a separate deal with Lazenby. In a share purchase agreement dated 15 January 2015, Rives agreed to buy Lazenby's interest in Steel Tube for $600,000. (*See* Joint Stipulation 3; Rives 17:5–9; Lazenby 5:17–6:8.) Rives paid nothing up front. Rather, the agreement called for a $20,000 lump sum payment within sixty days and $6,000 monthly installments afterward, and Lazenby reserved a security interest in the shares until the debt was paid. (*See* Rives 17:5–22; Lazenby 6:15–22.) Also as part of the deal, Rives assured Lazenby that Steel Tube would pay for his insurance going forward and promised to "protect" Lazenby's son, Mike, who worked at Steel Tube. (Rives 82:17–83:9; *see also* Lazenby 8:8–17.)

10. This left Potts and Rives as equal co-owners of Steel Tube. At their first shareholders' meeting in February 2015, they elected themselves as officers and directors. They also discussed an understanding that neither would spend more than $25,000 without first consulting the other. (*See* Potts 14:1–7; Rives 54:11–24.) According to Rives, the conversation did not result in a binding, written agreement.

(*See* Rives 54:25–57:9, 165:3–10.) Potts, however, testified that Rives made an oral promise. His testimony was corroborated by Janice Hatchell, a close advisor and employee, who attended the meeting. (*See* Potts 13:18–14:13, 15:17–16:15; Hatchell 13:18–14:11.)

11. Potts believes that Rives never intended to keep this promise. At trial, he presented testimony and other evidence designed to show that Rives began looting Steel Tube through a series of self-interested transactions, concealed his actions, and engaged in a pattern of deception.

12. To start, Potts offered evidence that Rives planned to pay his debt to Lazenby with Steel Tube's money, rather than his own. It is undisputed that Rives cut a $20,000 check from Steel Tube to Lazenby to pay the lump sum. (*See* Rives 81:22–25.)[2] Likewise, on the same day as his first shareholders' meeting with Potts, Rives began withdrawing $7,500 per month from Steel Tube's bank account, more than covering the $6,000 installments due to Lazenby. (*See* Rives 57:15–58:10, 61:13–25.) Potts was unaware of any of this and believes that Rives began secretly taking company funds to pay for a personal debt of $600,000 within hours or days of promising not to spend over $25,000 without consultation. (*See* Potts 17:1–8, 26:1–28:2, 113:23–114:1; Rives 58:2–23, 82:12–16.)

---

[2] Rives testified that this payment was also partly to compensate Roy Lazenby for driving a truck for Steel Tube from time to time after his resignation. (*See* Rives 80:4–17 ("As long as Roy drove a truck, that was okay with me. And he did and he loved it.").) Lazenby denied this. (*See* Lazenby 6:23–25 ("Q. Did you agree to drive a truck for Steel Tube in exchange for that $20,000? A. No.").)

13. There was also evidence that, around this time, Rives agreed to give Mike Lazenby a raise and a guaranteed bonus of $95,000, thus fulfilling the pledge to protect him. Rives testified that Potts approved the guaranteed bonus, (*see* Rives 84:3–8), which was supported by a written employment agreement bearing Potts's signature. But Hatchell, who took part in the discussions about the terms of the agreement, denied this and testified as to differences appearing in a draft version of the agreement, the supposed final version, and the signature page. (*See* Hatchell 103:7–107:7, 107:19–21.)

14. Next, Potts pointed to Rives's involvement with Elite Tube & Fab, LLC ("Elite Tube"). Rives and Todd Berrier (another of Rives's tax clients) formed Elite Tube in the spring of 2015 but installed their wives as the company's nominal owners. (Trial Test. of Todd Berrier 5:20–6:8, 10:25–11:3, ECF No. 257.1 ["Berrier"].) Although Elite Tube was really a "50/50 partnership" between Rives and Berrier, (Berrier 8:22), vesting ownership in their wives meant that "on paper it would not appear to be that way," (Berrier 11:21). In Berrier's words, Rives wanted to hide his links to Elite Tube due to "his affiliation with Steel Tube." (Berrier 11:7.) Rives confirmed as much. (*See* Rives 90:5–17.)

15. To get Elite Tube up and running, Rives channeled money and equipment from Steel Tube. This began with a $120,000 check that Elite Tube used to buy a piece of equipment known as a tube bender. (*See* Rives 95:12–14; Berrier 16:18–17:14.) Rives then moved another piece of equipment known as a roll former from Steel Tube to Elite Tube. (*See* Rives 96:13–16; Berrier 9:9–18.) Rives also arranged

it so that Mike Lazenby would receive a commission from Elite Tube for referrals. (*See* Rives 100:9–15; *see also* Berrier 12:17–13:11.) At no point did Rives tell Potts about any of this. (*See* Rives 90:18–91:13, 95:12–18, 96:13–16, 100:9–21.) Likewise, Berrier had never heard of Potts and was under the false impression that Rives was Steel Tube's sole owner. (*See* Berrier 4:20–5:1.)

16. Another issue concerned a $62,875 distribution that Rives took at the end of 2015 to cover his tax liability. Rives did not deny taking the distribution; rather, he maintained that Potts approved it. (*See* Rives 112:25–114:5, 197:11–198:25; *see also* Trial Test. of Diane Tomlin 25:11–20, ECF No. 257.7 ["Tomlin"].) Potts testified not only that he had not approved the distribution but also that Rives had agreed not to take one due to Steel Tube's weak financial position. (*See* Potts 53:1–9; *see also* Hatchell 43:9–44:24.) Potts and Hatchell further testified that, at the time Rives said he would not take a distribution, he had already done so without telling them. (*See* Potts 54:19–55:3; Hatchell 45:1–16; *see also* Rives 114:6–13 ("Q. So the answer is, yes, when you're meeting with Mr. Potts about it you had already taken the money? A. Yes."), 116:11–18 ("Q. When you met with him on Monday the 21st, you didn't tell him that you had already taken the money, did you? A. I don't know if I did or not.").)

17. During trial, Potts also questioned a transaction involving KEL, LLC—a company owned and operated by Rives's brothers. In April 2016, Rives helped form KEL and, shortly after, engaged it to handle Steel Tube's trucking needs. (*See* Rives 102:15 ("I'm not saying that I didn't have any involvement . . . ."); *see also* Rives 103:7–18, 186:16–187:4.) Rives did not tell Potts or Hatchell about his involvement

or that his brothers owned KEL. (*See* Rives 104:14–17; Hatchell 57:3–9.) Asked why, Rives said that it was none of their business. (*See* Rives 105:11–16 ("Q. And you didn't mention to Mr. Potts or Ms. Hatchell that your brothers owned KEL because, in your words, it was none of their business. A. I agree with you."); *see also* Rives 106:21–107:2.) In addition, there was evidence showing that Rives signed all checks paid to KEL rather than having Potts sign them—a departure from the usual practice. (*See* Potts 22:1–11, 34:12–35:20, 88:17–25; Rives 109:21–110:8; Tomlin 7:10–19, 9:8–15.)

18. The deal with KEL raised red flags for Hatchell because Steel Tube had always handled trucking operations internally and had made a profit doing so. According to Hatchell, Steel Tube began losing money due to KEL's commissions and lax payment of invoices. In an e-mail exchange with Rives, she remarked that "KEL sounds like a very questionable company" and suggested consulting a lawyer. (Hatchell 55:9–19.) Saying nothing about his involvement with KEL or his brothers' ownership, Rives promised to investigate and then assured Hatchell that everything "should be fine." (Hatchell 55:20–56:16; *see also* Rives 111:3–21.)

19. In the summer of 2016, Potts and Hatchell grew suspicious. Hatchell began investigating Steel Tube's records and, according to her testimony, discovered Rives's cash withdrawals, payments to Roy Lazenby, and involvement with Elite Tube. (*See* Hatchell 31:25–36:23.) She also claimed to have discovered that the financial reports she had received from Rives did not match what was in the company's computer system. (*See* Hatchell 23:2–16, 33:20–34:2, 57:23–58:9.) Convinced that the depletion

of cash was financially ruinous for Steel Tube, Potts confronted Rives. (*See* Potts 27:16–28:11.) Rives left the company and did not return. (*See* Rives 77:7–78:20.) To ease what he believed to be Steel Tube's dire condition, Potts injected $3 million of his own money. (*See* Potts 59:6–9.)

20. Steel Tube hired an accounting firm to investigate further. (*See* Hatchell 60:5–16.) Michael Borden, a CPA with Cannon & Company, testified that his firm found errors in Steel Tube's tax filings. Its 2015 tax return, for example, misstated its end-of-year stock and loan basis, mistreated Rives's $62,875 distribution, and improperly accounted for goodwill and special depreciation. (*See* Trial Test. of Thomas Borden 8:2–10:9, 16:15–17:14, ECF No. 257.2 ["Borden"].) In addition, a form used to convert Steel Tube into a subchapter S-corporation erroneously identified Rives as a shareholder as of October 2014 rather than January 2015. (*See* Borden 12:14–13:11.)[3] These errors benefited Rives. (*See, e.g.*, Rives 29:21–30:11; Borden 9:4–8, 15:25–16:8.) Steel Tube, on the other hand, incurred expenses in amending and correcting the filings. (*See, e.g.*, Borden 14:8–15:4, 18:22–19:3; Trial Test. of Gregory Reagan 41:10–42:5, ECF No. 217 ["Reagan"].)

21. The parties offered differing views at trial concerning who was responsible for the tax filings. Rives testified that he prepared all the forms and that his firm,

---

[3] Rives testified that he and Roy Lazenby had a deal in place by October 2014 that supported the S-corporation election. (*See, e.g.*, Rives 19:8–10 ("Q. Isn't it true, sir, that you told the IRS that you bought Mr. Lazenby's shares on October 1st of 2014? A. That's what me and Roy had agreed upon.").) Lazenby contradicted that testimony. (*See, e.g.*, Lazenby 13:12–18 ("Q. What date did you sell your shares in Steel Tube to Mr. Rives? A. January the 15th, 2015."), 26:19–21 ("Q. Did you still own your shares of [Steel Tube] on January 14, 2015? A. Yes.").)

Rives & Associates, was not responsible. (*See, e.g.*, Rives 24:15–17, 26:6–13, 118:10–23.) But other evidence showed that Rives used his firm's software to prepare the forms, that his partners and staff reviewed them, that his father was named as the paid preparer for the 2015 tax return, and that the cover letters received by Steel Tube carried a Rives & Associates logo and stated that the firm had prepared the documents. (*See, e.g.*, Rives 21:12–23:10, 118:10–123:8; Reagan 44:3–24.)

22. Two events that occurred after this suit began were also the subject of testimony. First, the parties stipulated that Rives defaulted on his payments to Roy Lazenby. Through an entity called Avalon1, LLC, Potts acquired Lazenby's security interest and repossessed the shares. (*See* Joint Stipulation 3.) Later, Avalon1 put Rives's shares up for bid at a public auction and, as the only bidder, bought them for $200,000 on 5 June 2017. (*See* Joint Stipulation 3–4.) The parties disputed whether Avalon1 properly notified Rives of the sale and whether the auction price accurately reflected the value of the shares. (*See, e.g.*, Hatchell 95:10–24.)

23. Second, although Elite Tube was once a defendant in this case, the claims against it were settled before trial. (*See* Berrier 20:13–21:5.) The parties stipulated that Potts recovered $120,000 and certain equipment from Elite Tube. (*See* Potts 108:13–24.) Berrier confirmed the settlement during his testimony. (*See* Berrier 21:18–23.)

24. Rounding out the trial evidence, Potts offered the expert testimony of Gregory Reagan. One aspect of his testimony related to the code of conduct and professional standards for CPAs, including obligations to maintain objectivity, to

monitor conflicts of interest, and not to deceive clients. (*See* Reagan 47:18–50:19.) According to Reagan, Rives & Associates had no "quality control system" to manage conflicts of interest and avoid harm to clients. (*See* Reagan 50:13–19.)

25. Reagan also testified as to damages. Among other things, Reagan addressed how much money Rives withdrew from Steel Tube, the amounts given to Roy and Mike Lazenby to pay Rives's debt and related promises, the tax distribution in December 2015, and losses from the transaction with KEL. (*See, e.g.*, Reagan 92:7–94:21.)

26. Reagan further testified that Rives's misconduct devastated Steel Tube's working capital. (*See* Reagan 53:23–56:2.) Comparing working capital in a company to "blood in your body," Reagan explained that "[i]f you don't have working capital you can't operate." (Reagan 54:13–15.) During Rives's tenure, Steel Tube's working capital swung from positive $600,000 to negative $1.6 million—a drop so large that Steel Tube "became an unstable business, and actually it became insolvent." (Reagan 55:7–16.) This, he said, contributed to the diminution of Steel Tube's value by more than $1.3 million, (*see* Reagan 98:1–20), as well as nearly $300,000 in interest on loans to keep the company afloat, (*see* Reagan 60:8–22, 97:6–25). Reagan tallied over $2.2 million in total damages.[4] (*See* Reagan 98:21–99:1.)

---

[4] This figure was substantially less than Potts originally sought. In a pretrial ruling, the Court excluded several opinions offered by Reagan that involved another $400,000 or so in purported damages to Steel Tube. *See Potts III*, 2019 NCBC LEXIS 61, at *22–25. At trial, the Court excluded additional amounts based on challenges by Defendants. (*See* Reagan 88:21–90:1.) The Court overruled a number of other objections by Defendants, many of which are discussed below in connection with the analysis of the pending motions.

27. This expert testimony was largely unrebutted. Although Defendants extensively cross-examined Reagan, they presented no expert testimony of their own.

B. Procedural Posture

28. At the close of Potts's evidence, Defendants moved for a directed verdict on all claims against them. The Court granted the motion in part, dismissing Potts's claims for conspiracy and facilitation of fraud but deferring a ruling on other claims. At the close of all evidence, the Court denied Defendants' renewed motion. Potts also moved for a directed verdict, which the Court granted, dismissing Rives's counterclaims for breach of fiduciary duty, declaratory judgment, and quantum meruit. (*See* Final Judgment 2, ECF No. 212.)

29. Ten issues were submitted to the jury. These included issues related to Potts's derivative claims against Rives for breach of fiduciary duty, constructive fraud, conversion, and fraud; Potts's derivative claim against Rives & Associates for professional negligence; and the dispute over the reasonableness of Avalon1's sale of Rives's shares of Steel Tube. The jury returned a verdict largely in favor of Potts but did not award the full amount of damages that he had sought. In short, the jury found Rives liable for breach of fiduciary duty, constructive fraud, and conversion and awarded damages of $1,285,750 for those three claims. In addition, the jury found Rives liable for fraud and awarded another $390,096 in damages. With respect to professional negligence, the jury found Rives & Associates liable in the amount of $40,000. Finally, the jury found that Avalon1 had provided reasonable notification

to Rives of the public sale of his shares and that it had sold the shares in a commercially reasonable manner. (*See* Verdict Sheet, ECF No. 209.)

30. At Defendants' request, the Court bifurcated issues related to punitive damages. In this second phase, the jury again returned a verdict in favor of Potts and awarded punitive damages of $300,000 against Rives and $200,000 against Rives & Associates. (*See* Suppl. Verdict Sheet, ECF No. 211.)

31. After the Court entered final judgment, Defendants timely moved for judgment notwithstanding the verdict and for a new trial. (ECF Nos. 213, 215.) These motions are now ripe for resolution.

II.
MOTION FOR JNOV

32. "When a motion for judgment notwithstanding the verdict is joined with a motion for a new trial, it is the duty of the trial court to rule on both motions." *Clayton v. Branson*, 170 N.C. App. 438, 442 (2005) (citation and quotation marks omitted). In the interests of judicial economy, courts should consider the motion for judgment notwithstanding the verdict ("JNOV") before turning to the motion for new trial. *Id.*

33. A motion for JNOV under Rule 50(b) "tests the legal sufficiency of the evidence to take the case to the jury and support a verdict for the nonmovant." *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 720 (2009) (citation and quotation marks omitted). The motion "is essentially a renewal of an earlier motion for directed verdict." *Id.* (citation and quotation marks omitted). Thus, a party may move for JNOV only on the same issues that were raised in the earlier motion for directed

verdict. *See Shaw v. Gee*, 2018 NCBC LEXIS 109, at \*11 (N.C. Super. Ct. Oct. 19, 2018) (citing N.C. R. Civ. P. 50(b)(1)).

34. The moving party "bears a heavy burden." *Taylor v. Walker*, 320 N.C. 729, 733 (1987). Granting JNOV is improper "unless it appears, as a matter of law, that a recovery cannot be had by the plaintiff upon any view of the facts which the evidence reasonably tends to establish." *Scarborough*, 363 N.C. at 720 (citation and quotation marks omitted). A motion for JNOV "is cautiously and sparingly granted," *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369 (1985), and should be denied if there is "more than a scintilla of evidence" to support the claim, *Morris v. Scenera Rsch., LLC*, 368 N.C. 857, 861 (2016) (citation and quotation marks omitted). A scintilla is "very slight evidence" but must "do more than raise a suspicion, conjecture, guess, surmise, or speculation as to the pertinent facts." *Id.* (citations and quotation marks omitted). In ruling on the motion, the Court "must consider the evidence in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences to be drawn therefrom and resolving all conflicts in the evidence in his favor." *Taylor*, 320 N.C. at 733–34.

35. Defendants have moved for JNOV on the fraud claim against Rives, the punitive damages award against Rives & Associates (but not the underlying professional negligence claim), and the finding that Avalon1 gave reasonable notification to Rives before disposing of his stock. (*See* Br. in Supp. JNOV 9, 16, 20, ECF No. 214.)

A. Fraud

36. A claim for fraud has five "essential elements": "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138 (1974). The plaintiff's reliance on the fraudulent misrepresentation "must be reasonable." *Forbis v. Neal*, 361 N.C. 519, 527 (2007). "Whether each of the elements of actual fraud and reasonable reliance are met are ordinarily questions for the jury 'unless the facts are so clear that they support only one conclusion.'" *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9 (2018) (quoting *Forbis*, 361 N.C. at 527).

37. Potts bases this claim on Rives's representations that he would not spend more than $25,000 without consulting Potts and that "he would not take any monetary distributions from Steel Tube without Potts's approval." (Jury Instrs. 16, ECF No. 208; *see also* Verified Am. Compl. ¶ 59, ECF No. 17.) In his JNOV motion, Rives does not address the second representation. Rather, he raises three discrete arguments concerning only the promise not to spend over $25,000 without Potts's approval.

*1. Date of Misrepresentation*

38. First, Rives argues that Potts did not present enough evidence to show when the misrepresentation was made. In support, Rives contends that "[t]he plaintiff must show the date [of the alleged misrepresentation] with definiteness and

specificity" but that Potts gave conflicting testimony on the subject. (Br. in Supp. JNOV 11–12.)

39. This argument is rooted in a misunderstanding of the law. A "misrepresentation must be definite and specific" to support a claim for fraud, "but the specificity required depends upon the tendency of the statements to deceive under the circumstances." *Ragsdale*, 286 N.C. at 139. There is no requirement that a plaintiff prove that the misrepresentation was made on a specific date. It is enough to plead and prove the approximate time period and related circumstances. *See, e.g.*, *Terry v. Terry*, 302 N.C. 77, 80–87 (1981) (addressing allegation that fraud occurred in the "two months prior to [plaintiff's father's] death"); *Perkins v. HealthMarkets, Inc.*, 2007 NCBC LEXIS 25, at *12 (N.C. Super. Ct. July 30, 2007) (addressing allegation that misrepresentation was made "sometime in mid-November 2003").

40. More than one witness testified that Rives made a definite and specific promise not to spend over $25,000 unless Potts agreed. (*See, e.g.*, Potts 14:2–7, 76:17–18; Hatchell 13:20–14:11.) In addition, Potts and Hatchell each testified that Rives made the promise at the directors' meeting on 6 February 2015 or around that time. (*See* Potts 14:2–8, 16:9–15, 113:2–6, 151:4–7; Hatchell 9:9–12, 13:18–14:11.) Rives likewise confirmed that he discussed a spending limit with Potts in February 2015, although he denied that any promise resulted from those discussions. (*See* Rives 54:8–24.) That is more than enough evidence to support the jury's verdict. *See, e.g.*, *Ragsdale*, 286 N.C. at 139; *Hudgins v. Wagoner*, 204 N.C. App. 480, 490 (2010).

41. Rives points to other evidence that could be viewed as favorable to his defense. As an example, the minutes of the directors' meeting do not refer to limits on dispositions over $25,000. (*See* Potts 76:9–14.) In addition, Potts sometimes misstated the date of the directors' meeting and at other times testified that he could not recall the exact date of the misrepresentation. (*See* Potts 16:9–15, 72:22–25, 76:19–77:1.) These discrepancies go to the credibility and weight—not the sufficiency—of the evidence and were for the jury to resolve. Indeed, even discounting Potts's testimony, the jury was entitled to credit Hatchell's independent testimony concerning the circumstances of the misrepresentation. *See, e.g., Aldridge v. Hasty*, 240 N.C. 353, 362 (1954) (stressing that it is up to the jury to "reconcile the inconsistent, conflicting, or contradictory testimony").

## 2. *Meeting of the Minds*

42. Second, Rives contends that he and Potts discussed a limitation on expenditures, acquisitions, and dispositions of property in the context of a draft shareholder agreement. Because the shareholder agreement was never finalized and executed, he contends, there was no "meeting of the minds," no valid contract, and no promissory misrepresentation. (Br. in Supp. JNOV 12–14.)

43. The Court disagrees. Viewed in a light most favorable to Potts, the evidence tends to show that there was an oral agreement concerning expenditures over $25,000 and, thus, a meeting of the minds. (*See, e.g.*, Potts 14:2–15, 70:10–72:10; Hatchell 13:18–14:11, 146:19–147:13.) Whether Potts and Rives did or did not memorialize their agreement in a written contract is irrelevant.

44.     And in any event, Potts had no burden to prove a meeting of the minds. He offered evidence that Rives falsely promised not to spend more than $25,000 without approval. Assuming the other elements of fraud are met, that false promise may support a claim for fraud even if Potts and Rives did not enter into a binding, written contract. *See, e.g.*, *Hudgins*, 204 N.C. App. at 486–92 (affirming denial of JNOV motion); *Leftwich v. Gaines*, 134 N.C. App. 502, 507–10 (1999) (affirming denial of directed verdict and JNOV motions); *Wood v. Nelson*, 5 N.C. App. 407, 409–11 (1969) (affirming denial of motion for nonsuit).

### 3. *Intent to Deceive*

45.     Finally, Rives argues that there was insufficient evidence of intent to deceive. In his view, the evidence does not show that he made the promise regarding expenditures over $25,000 with no intent to keep it. (*See* Br. in Supp. JNOV 14–15.)

46.     Usually, "an unfilled promise cannot be made the basis for an action for fraud." *Pierce v. Am. Fid. Fire Ins. Co.*, 240 N.C. 567, 571 (1954). But "[a] promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply." *Hudgins*, 204 N.C. App. at 490–91 (citation and quotation marks omitted); *see also Braun v. Glade Valley Sch., Inc.*, 77 N.C. App. 83, 87 (1985). Thus, there must be evidence from which the "jury may reasonably infer that the defendant did not intend to carry out such representations when they were made." *Whitley v. O'Neal*, 5 N.C. App. 136, 139 (1969); *see also Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 700 (2009).

47. Direct evidence is not required. "Juries often have little access to direct evidence of a person's intent and therefore may infer intent from the totality of the properly admitted evidence." *Hudgins*, 204 N.C. App. at 491. Circumstantial evidence of intent may include, among other things, a motive to deceive, close proximity between the promise and the breach, efforts to conceal nonperformance from the promisee, and a broader pattern of deceit. *See, e.g., Calloway v. Wyatt*, 246 N.C. 129, 133–34 (1957); *Jones v. Harrelson & Smith Contractors, LLC*, 194 N.C. App. 203, 214–15 (2008), *aff'd per curiam*, 363 N.C. 371 (2009); *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 481 (2004); *Meekins v. Box*, 152 N.C. App. 379, 386–89 (2002); *Carver v. Roberts*, 78 N.C. App. 511, 513–14 (1985).

48. At trial, Potts offered considerable evidence of Rives's intent to deceive. The evidence showed, for example, that Rives owed $600,000 to Roy Lazenby. (*See* Rives 17:5–11; Lazenby 5:17–6:14, 7:12–8:7.) Rives did not put any of his own money toward that debt. Rather, he paid for Lazenby's shares with *Steel Tube's* money—a direct transfer of $20,000 to Lazenby as a down payment and additional monthly payments taken from withdrawals (another $100,000 or so over time) that Rives made from company accounts. (*See* Rives 17:5–18:10, 79:19–82:11; Hatchell 38:11–16; Tomlin 16:8–13, 20:19–21:5.) Indeed, Rives began making these transfers and withdrawals just after the February 2015 meeting with Potts. (*See* Potts 17:1–8, Tomlin 14:10–25, 19:25–21:5.) This short period between promise and breach suggests that Rives never intended to keep his promise, and the use of company funds

to pay his sizeable personal debt is strong evidence of motive to deceive. *See, e.g.*, *Hudgins*, 204 N.C. App. at 491.

49. Furthermore, Potts offered evidence of a pattern of deception and a larger scheme of self-dealing. For example, at the end of 2015, Rives promised not to take a distribution to cover his tax liability even though he had already done so. (*See* Rives 114:11–13 ("Q. So the answer is, yes, when you're meeting with Mr. Potts about it you had already taken the money? A. Yes."); *see also* Potts 53:1–55:3; Hatchell 43:9–17; Tomlin 25:11–20.) Likewise, Rives funneled cash and equipment—worth hundreds of thousands of dollars—to companies in which he and his family held interests. (*See, e.g.*, Rives 75:7–76:19, 91:10–92:3, 94:10–95:7, 101:22–25.)

50. Other evidence suggests that Rives tried to cover up his actions. When confronted about the monthly withdrawals, for example, Rives denied taking them and then continued to do so. (*See* Potts 17:9–17, 18:11–23, 28:7–11; Hatchell 75:19–25.) In addition, Rives named his wife as a straw owner of Elite Tube to conceal his involvement with the company. (*See* Rives 90:11–17 ("I did not want that to be public knowledge necessarily. I do lots of things that I don't necessarily want to be public knowledge."); *see also* Berrier 10:25–11:21.) Likewise, Rives said nothing about his or his brothers' involvement with KEL, and he made sure to sign checks to KEL even though Potts usually signed Steel Tube's checks. (*See* Rives 105:11–107:2, 109:21–110:8.) And there was also evidence that Rives supplied false information to Potts and Hatchell and manipulated the company's books and financial reports. (*See, e.g.*,

Hatchell 33:20–34:2, 35:10–36:23, 57:23–25, 60:17–20, 70:9–17, 71:10–72:6, 74:4–11; Reagan 28:16–24, 29:5–20.)

51. Taken together, this evidence amply supports the verdict. Presented with "evidence of concealment, evasion, and ulterior motives," the jury could have reasonably inferred that Rives had no intent to keep his promises not to take distributions or spend over $25,000 without Potts's approval. *Brown v. Secor*, 2020 NCBC LEXIS 134, at *17 (N.C. Super. Ct. Nov. 13, 2020).

*4. Summary*

52. In sum, Rives has not carried his heavy burden to overturn the jury's verdict as to the fraud claim.

## B. Punitive Damages

53. During the compensatory phase, the jury found both Defendants liable—Rives for breach of fiduciary duty, conversion, constructive fraud, and fraud, and Rives & Associates for professional negligence. (*See* Verdict Sheet.) The jury then awarded punitive damages of $300,000 against Rives and $200,000 against Rives & Associates. (*See* Suppl. Verdict Sheet, Issue No. 2.) Rives & Associates challenges the punitive damages award against it.

54. Punitive damages are appropriate "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C.G.S. § 1D-1. Punitive damages may be awarded only if an aggravating factor—fraud, malice, or willful and wanton conduct—"was present and

was related to the injury for which compensatory damages were awarded." *Id.* § 1D-15(a).

55. The Court instructed the jury on willful or wanton conduct and fraud, but not malice. (*See* Suppl. Jury Instrs. 3, ECF No. 210.) By statute, willful or wanton conduct is "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C.G.S. § 1D-5(7). It means "more than gross negligence." *Id.* Additionally, fraud "does not include constructive fraud unless an element of intent is present." *Id.* § 1D-5(4).

56. A corporate defendant may be held liable for punitive damages in two ways: (1) on a theory of direct liability when the "corporation's acts or policies constitute the aggravating factor," *Everhart v. O'Charley's, Inc.*, 200 N.C. App. 142, 153 (2009), and (2) on a theory of vicarious liability when "the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages," N.C.G.S. § 1D-15(c). *See also Everhart*, 200 N.C. App. at 152–53 (distinguishing between a corporate defendant's direct and vicarious liability for punitive damages). Here, the jury was instructed only on vicarious liability. (*See* Suppl. Jury Instrs. 3.)

*1. Professional Negligence as a Basis for Punitive Damages*

57. Rives & Associates begins by arguing that "[a] claim for professional negligence does not support an award of punitive damages . . . ." (Br. in Supp. JNOV 16.) It cites no authority for this position, which is inconsistent with the governing

statute and case law. Although section 1D-15 bars punitive damages "solely for breach of contract," it has no similar exclusion for professional negligence or any other type of negligence claim. N.C.G.S. § 1D-15(d). Indeed, our Supreme Court has held that a claim for ordinary negligence may support a demand for punitive damages if the plaintiff pleads and proves related willful and wanton conduct. *See Estate of Long v. Fowler*, 378 N.C. 138, 150–54 (2021). Accordingly, a claim for professional negligence may support an award of punitive damages so long as the other requirements of section 1D-15 are met.

*2. Scope of Vicarious Liability for Punitive Damages*

58.     Rives & Associates next argues—in a single paragraph—that limited liability partnerships may never be held vicariously liable for punitive damages. Section 1D-15(c) states that punitive damages "shall not be awarded against a person solely on the basis of vicarious liability for the acts or omissions of another" except "if, in the case of a *corporation*, the officers, directors, or managers of the *corporation* participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." N.C.G.S. § 1D-15(c) (emphases added). According to Rives & Associates, this means that punitive damages may not be awarded "against entities other than corporations"—presumably including limited liability partnerships, limited liability companies, and all other entities other than those organized under the North Carolina Business Corporation Act. (Br. in Supp. JNOV 17.)

59.     No court has interpreted section 1D-15(c) in that fashion. Indeed, numerous cases have applied the statute to partnerships and other entities. *See, e.g.*, *Austin v.*

*Bald II, L.L.C.*, 189 N.C. App. 338, 344–45 (2008) (reversing trial court's refusal to instruct jury as to demand for punitive damages against limited liability company); *Phillips v. Rest. Mgmt. of Carolina, L.P.*, 146 N.C. App. 203, 215–16 (2001) (applying statute to limited partnership but denying punitive damages on other grounds); *Abel v. Carolina Stalite Co., LP*, 2004 U.S. Dist. LEXIS 5303, at *17–19 (M.D.N.C. Mar. 18, 2004) (denying motion for summary judgment by limited partnership).[5] And the federal Court of Appeals for the Fourth Circuit has rejected the position pressed by Rives & Associates: "Although the statute specifically refers to 'corporations' and not other business entities with employees, North Carolina courts nonetheless apply the statute to limited liability companies *and partnerships*." *Vandevender v. Blue Ridge of Raleigh, LLC*, 2018 U.S. App. LEXIS 24196, at *8–9 (4th Cir. Aug. 2, 2018) (emphasis added).

60.     The Court sees no reason to find fault in these decisions. Because the statute does not define "corporation," the term takes its ordinary meaning. *See Morgan v. Hertford*, 70 N.C. App. 725, 728 (1984). Dictionaries offer various formulations,[6] but all say roughly the same thing: "a single person or object treated

---

[5] *See also, e.g.*, *Slattery v. AppyCity, LLC*, 2021 NCBC LEXIS 24, at *29–31 (N.C. Super. Ct. Mar. 24, 2021); *BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at *50–51 (N.C. Super. Ct. Mar. 20, 2014), *aff'd*, 264 N.C. App. 282 (2019); *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 965–72 (4th Cir. 2020); *Pracht v. Saga Freight Logistics, LLC*, 2015 U.S. Dist. LEXIS 138230, at *12–22 (W.D.N.C. Oct. 9, 2015); *Jenkins v. Receivables Performance Mgmt., LLC*, 2010 U.S. Dist. LEXIS 91635, at *4–6 (W.D.N.C. Sept. 1, 2010).

[6] *Compare Corporation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/corporation ("a body formed and authorized by law to act as a single person although constituted by one or more persons and legally endowed with various rights and duties including the capacity of succession"), *with Corporation*, Webster's New World Dictionary (1967 ed.) ("a group of people who get a charter granting them as a body certain of the legal rights and liabilities of a single individual"); *compare Corporation*, Black's Law Dictionary

by the law as having a legal individuality or entity other than that of a natural person." *Id.* (quoting Webster's Third New International Dictionary 510 (1968)). This expansive definition goes beyond entities organized under the North Carolina Business Corporation Act and is broad enough to apply when, as here, a partnership exists as an entity distinct from its members. *See Trujillo v. N.C. Grange Mut. Ins. Co.*, 149 N.C. App. 811, 815 (2002) ("A partnership is a distinct entity from the individual members constituting it." (citation and quotation marks omitted)); *cf. Goldstein v. Roxborough Real Estate LLC*, 677 Fed. App'x 796, 798 (3d Cir. 2017) ("*Corporations, including limited partnerships*, may appear in federal court only through counsel." (emphasis added)).

61.   For the first time in its reply brief, Rives & Associates argues that this interpretation conflicts with the nature of limited liability partnerships and would improperly render some partners "*personally* liable" for the conduct of others. (Reply Br. in Supp. JNOV 11, ECF No. 225.) This is not convincing. It is the partnership as an entity that is liable. And by statute, a partner in a limited liability partnership "is not individually liable for debts and obligations of the partnership . . . solely by reason of being a partner." N.C.G.S. § 59-45(a1). Just as the partners of Rives &

---

(10th ed. 2014) ("a group or succession of persons established in accordance with legal rules into a legal or juristic person that has a legal personality distinct from the natural persons who make it up, exists indefinitely apart from them, and has the legal powers that its constitution gives it"), *with Corporation*, Black's Law Dictionary (4th ed. 1951) ("An artificial or legal entity created by or under the authority of the laws of a state . . . ordinarily consisting of an association of numerous individuals, who subsist as a body politic under a special denomination, which is regarded in law as having a personality and existence distinct from that of its several members . . . and . . . acting as a unit or single individual in matters relating to the common purpose of the association").

Associates are not personally liable for compensatory damages awarded against the firm for professional negligence, neither are they personally liable for punitive damages. Thus, no conflict arises from applying section 1D-15(c) to limited liability partnerships. On the other hand, construing section 1D-15(c) in the narrow fashion urged by Rives & Associates would undermine the statute's purpose, which is to punish and deter wrongful acts. *See id.* § 1D-1; *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 166–67 (2004).

62. The Court therefore concludes that section 1D-15(c) does not bar an award of punitive damages against Rives & Associates on a theory of vicarious liability.

### 3. *Sufficiency of the Evidence*

63. Rives & Associates also argues that it cannot be held vicariously liable for Rives's conduct because there was insufficient evidence that Rives was acting as an agent of Rives & Associates rather than Steel Tube. (*See* Br. in Supp. JNOV 18–19; Reply Br. JNOV 11–14.) The Court concludes that there was sufficient evidence to support the jury's verdict.

64. First, Rives & Associates has not challenged the sufficiency of the evidence as to the underlying professional negligence claim. The evidence shows that Rives improperly backdated Steel Tube's S-corporation election form, voiding the election. (*See* Rives 28:9–24, 173:13–24; Borden 23:14–24:4; Reagan 41:10–22.) In preparing the company's tax returns, Rives miscategorized his $62,875 distribution, improperly addressed goodwill and special depreciation, and made other errors. (*See, e.g.*, Rives 179:21–180:11; Reagan 27:19–32:6; Borden 8:2–10:1, 15:7–17:14; Hatchell 112:5–

113:13.) Many of these errors were designed to benefit Rives—for example, allowing him to claim Steel Tube's losses on his personal tax return—but ultimately harmed Steel Tube through tax penalties and other expenses. (*See* Reagan 118:15–119:10.)

65. Second, there was ample evidence that Rives performed this work on behalf of Rives & Associates. (*See, e.g.*, Reagan 42:23–44:24.) Cover letters received by Steel Tube carried a Rives & Associates logo and referred to "professional services rendered in connection with the preparation of" tax filings that "we" (Rives & Associates) compiled. (Rives 21:12–23:10, 119:6–123:8.) In addition, others at Rives & Associates, including partners, reviewed the documents. (*See* Rives 27:3–12, 118:10–119:5, 138:11–139:15.) And the documents identified the firm itself and a partner other than Rives as the "paid preparer." (Rives 24:18–22, 25:17–26:9, 124:3–8; *see also* Hatchell 108:13–109:15; Borden 5:11–19.) According to Hatchell, Steel Tube and its employees viewed both Rives and Rives & Associates as responsible for Steel Tube's tax filings. (*See* Hatchell 27:6–9, 29:20–21; *see also* Borden 5:11–13.)

66. Although Rives insists that his duties for Rives & Associates were distinct from his duties for Steel Tube, the jury was not required to credit his testimony. Quite a bit of evidence suggests that the lines were blurred. Rives & Associates had, after all, served as Steel Tube's accounting firm for several years before Rives acquired an interest in the company. (*See* Rives 9:8–15; Hatchell 6:17–22.) And when Rives joined Steel Tube, he promised that "[he] and his firm, Rives and Associates, would take care of . . . the financial matters" at Steel Tube. (Hatchell 11:16–24; *see also* Hatchell 27:6–9, 29:20–21, 84:25–85:4.) This is supported by the documents

themselves, which purport to come from Rives & Associates, and by the fact that employees of the firm, including Rives's brothers, made themselves available to answer questions about the returns. (*See, e.g.*, Hatchell 27:10–28:25.)

67. Third, the jury reasonably found the necessary aggravating factor by clear and convincing evidence. Rives & Associates argues that the evidence of fraud is not pertinent because the fraud claim is against Rives, not the firm, and is unrelated to the tax filings. (*See* Reply Br. JNOV 8, 10 n.1.) Not so. Fraudulent conduct may support punitive damages even without a claim for fraud. *See Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 395–96 (1985). The question is whether there is evidence of deceitful conduct related to the professional negligence claim. *See, e.g.*, *Bogovich v. Embassy Club of Sedgefield, Inc.*, 211 N.C. App. 1, 15–17 (2011). Here, the conduct is related because there is evidence that Rives falsified the tax documents at issue to advance and to conceal his fraud and other wrongdoing. (*See, e.g.*, Hatchell 108:14–113:13 (misidentification of bender); Borden 10:15–11:12 (treatment of compensation), 15:7–16:8 (unverified assets).)

68. Moreover, some evidence suggests that Rives had the support of the firm. Other partners and employees of Rives & Associates reviewed and approved filings over an extended period of time. (*See* Rives 27:3–12, 118:10–119:5, 138:11–139:15; Reagan 43:24–44:24.) There was also evidence, apart from the negligent tax work, to show that the firm's partners and employees participated in and benefited from Rives's wrongdoing: his brothers were not only the undisclosed owners of KEL but also insiders at Rives & Associates. (*See* Rives 142:13–143:13; Hatchell 49:8–50:12.)

In addition, Reagan testified—without rebuttal—that Rives & Associates had a duty to implement policies and procedures to identify and monitor conflicts of interest. No such policies existed. (*See* Reagan 8:21–9:5, 49:23–50:19.) In other words, over a period of about two years, the partners and employees of Rives & Associates reviewed and helped prepare negligent tax documents that furthered the fraud of the firm's managing partner, all while failing to adopt even the most basic, industry-standard guardrails. From this evidence, the jury could have reasonably found "a repeated course of conduct which constituted a callous or intentional indifference" to the plaintiff's rights. *Patrick v. Williams*, 102 N.C. App. 355, 369 (1991).

### 4. Constitutional Challenge

69.   Defendants assert that "submission of punitive damages is in violation" of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the Law of the Land Clause of the North Carolina Constitution. (Br. in Supp. JNOV 19.) They advance no argument in support of that assertion, and the Court's instructions complied with the punitive damages statute. Therefore, they have not overcome the presumption of constitutionality. *See Rhyne*, 358 N.C. at 167–68; *Arizona v. United States*, 567 U.S. 387, 415 (2012).

### 5. Summary

70.   For all these reasons, the Court denies the motion for JNOV as to the punitive damages award.

## C. Notification of Disposition of Collateral

71.    In his deal with Rives, Roy Lazenby received a security interest in the stock that he was selling.  Avalon1 later acquired the security interest from Lazenby and, when Rives defaulted, repossessed the shares and disposed of them through a public sale.  (*See* Joint Stipulation 3–4.)  At trial, the jury rendered a verdict that Avalon1 gave Rives reasonable notification of the public sale.  (*See* Verdict Sheet, Issue No. 7(a).)  Rives now seeks JNOV on the ground that this verdict is not supported by the evidence.  (*See* Br. in Supp. JNOV 20–21.)

72.    Before disposing of collateral, a secured party must send the debtor "an authenticated notification of disposition."   N.C.G.S. § 25-9-611(c)(1); *see also id.* § 25-9-610(b).  Notice may be sent by mail "addressed to any address reasonable under the circumstances," *id.* § 25-9-102(77)(a), and may be valid "whether or not the other person actually comes to know of it," *id.* § 25-1-202(d).   Commercial reasonableness is "an issue of fact determined in light of the relevant circumstances of each case." *Com. Credit Grp., Inc. v. Barber*, 199 N.C. App. 731, 737 (2009) (citation and quotation marks omitted).

73.    It is undisputed that Avalon1 sent a notification to a known address for Rives.  He did not receive the notification, however, because he had separated from his wife and no longer lived at the address.  According to Rives, it was well known that he had moved to a new address, and the notification was not reasonable as a result.

74.    Viewed in a light most favorable to Avalon1, the evidence supports the verdict.  Hatchell testified that she used the address that appeared in Rives's K-1 and company life insurance policy and that Rives himself had confirmed in his answer[7] in this litigation.  (*See* Hatchell 95:10–24; *see also* Rives 132:11–133:1.)  She further testified that Rives had not informed her that he had relocated.  (*See* Hatchell 96:4–9; *see also* Tomlin 50:9–17 (testimony of Tomlin that she was unaware Rives had separated from his wife).)  Rives maintains that, given the uncertainty over his living arrangements, Avalon1 should have sent notice to his counsel, but that is not required by the statute.  Whether notification is reasonable is a fact-intensive inquiry that demands consideration of the circumstances as a whole.  Weighing all the evidence, the jury could have concluded that Avalon1 sent the notification to Rives's last known address and that it was reasonable to do so.  Rives has not shown that he is entitled to JNOV on this issue.

### III.
### MOTION FOR A NEW TRIAL

75.    Defendants have also moved for a new trial under Rule 59.  They assert numerous, scattershot arguments touching on many issues of liability and damages.  Before considering each argument in turn, the Court first summarizes the legal principles governing motions for new trial.

---

[7] It is perhaps worth noting that Rives was given a chance to explain why he had admitted living at the address in his answer when, in fact, he had moved.  Instead, he denied having made the admission at all.  Given a copy of the answer to refresh his recollection, Rives simply denied what his pleading said.  (*See* Rives 134:11–136:6.)

A. <u>Legal Standards</u>

76.    Under Rule 59, a trial court may order a new trial on various grounds, including the following:

(1) Any irregularity by which any party was prevented from having a fair trial;

. . .

(6) Excessive or inadequate damages appearing to have been given under the influence of passion or prejudice;

(7) Insufficiency of the evidence to justify the verdict or that the verdict is contrary to law;

(8) Error in law occurring at the trial and objected to by the party making the motion, or

(9) Any other reason heretofore recognized as grounds for new trial.

N.C. R. Civ. P. 59(a)(1), (6)–(9).  Granting a new trial under Rule 59 is within the Court's sound discretion.  *See Xiong v. Marks*, 193 N.C. App. 644, 654 (2008).  The exception is Rule 59(a)(8), which can involve questions of law.  *See id.*

77.    Under Rule 59(a)(1), the Court considers whether there was some irregularity or error that prejudiced the moving party.  *See Sisk v. Sisk*, 221 N.C. App. 631, 635 (2012).

78.    To determine whether a damages award was excessive or inadequate under Rule 59(a)(6), the Court "must consider the testimony and evidence presented at trial."  *Guox v. Satterly*, 164 N.C. App. 578, 581 (2004).  A new trial will be denied if the movant points to nothing other than the award itself to suggest that the jury disregarded the Court's instructions or awarded punitive damages under the influence of passion or prejudice.  *See Everhart*, 200 N.C. App. at 161.  A new trial is not warranted if the verdict "was consistent with plaintiff's evidence," even if "it is

unclear exactly how the jury reached its overall figure." *Blakeley v. Town of Taylortown*, 233 N.C. App. 441, 449 (2014).

79. Under Rule 59(a)(7), a new trial may be granted based on insufficiency of evidence or a verdict contrary to law. As to insufficiency of evidence, a new trial is proper only if "the verdict was against the greater weight of the evidence." *Justus v. Rosner*, 371 N.C. 818, 825 (2018) (citation and quotation marks omitted). A new trial is improper if the jury's determination of a "fact-intensive question" was "reasonable" and did not "amount to a 'substantial miscarriage of justice.'" *Chalk v. Braakman*, 2019 N.C. App. LEXIS 263, at *16 (N.C. Ct. App. Mar. 19, 2019) (quoting *Justus*, 371 N.C. at 825).

80. Under Rule 59(a)(8), the movant must have made a timely objection. *See Piazza v. Kirkbride*, 372 N.C. 137, 165–166 (2019). When the movant takes issue with the failure to provide a jury instruction, including a limiting instruction, he must show (1) that the requested instruction "was a correct statement of law and was supported by the evidence"; (2) that the instruction given by the Court, "considered in its entirety, failed to encompass the substance of the law"; and (3) that the failure to give the instruction "likely misled the jury." *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 78 (2004). The movant must also show that he was prejudiced by the omission. *See Trang v. L J Wings, Inc.*, 268 N.C. App. 136, 139 (2019).

81. Finally, Rule 59(a)(9) authorizes the Court "to order a new trial when the ends of justice will be served." *Boykin v. Wilson Med. Ctr.*, 201 N.C. App. 559, 561 (2009) (citation and quotation marks omitted). Under this provision, a new trial is

proper to prevent a "palpable miscarriage of justice," when "justice and equity so require," or "when it would work an injustice to let the verdict stand." *Id.* (citations and quotation marks omitted).

B. General Mismanagement

82. According to Defendants, Potts pursued a theory of liability at trial (based on mismanagement) that differed from the theory pleaded in his amended complaint (based on self-dealing). Although their briefing is somewhat unclear, Defendants appear to argue that the Court should have sustained their objections to four categories of damages evidence: loan interest incurred by Steel Tube, diminution in the company's value, compensation paid to Mike Lazenby, and health insurance premiums paid on behalf of Roy Lazenby and his wife. Defendants argue that admission of this evidence was contrary to the pretrial *Daubert* ruling and that, based on this evidence, the jury awarded damages unrelated to the self-dealing transactions at issue. (*See* Br. in Supp. New Trial 13–16, ECF No. 216.)

83. This argument mischaracterizes the pretrial proceedings and the evidence at trial. To start, the Court's rulings at trial were not inconsistent with the *Daubert* order. Consider, for example, the evidence related to loan interest. In their pretrial motion, Defendants moved to exclude Reagan's opinion on that issue on grounds—raised for the first time in a reply brief—that had nothing to do with the underlying theory of liability. The Court concluded that Reagan's opinion was neither unreliable nor speculative and declined to exclude it. *See Potts III*, 2019 NCBC LEXIS 61, at *20–22. Likewise, although Defendants objected to Reagan's opinions about Mike

Lazenby's compensation and about insurance payments for Roy Lazenby and his wife, "their barebones arguments provide[d] no reasoned basis to exclude" those opinions. *Id.* at \*15 n.3. Defendants did not challenge Reagan's opinion regarding diminution in value at all. *See id.* at \*20. In short, the Court either declined to exclude this evidence before trial or was never asked to do so.

84. To be sure, the Court agreed with Defendants that several other opinions offered by Reagan were irrelevant because they went to issues outside the amended complaint. *See id.* at \*22–25. This favorable decision, which greatly reduced Defendants' damages exposure, remained effective throughout trial. The excluded evidence was not introduced, and Defendants do not argue otherwise. Again, there was no inconsistency between the pretrial and trial rulings.

85. Furthermore, Defendants have not given any persuasive reason why the disputed evidence should have been excluded at trial. Potts offered substantial evidence to show that each category of damages stemmed from Rives's self-dealing. This included expert testimony from Reagan showing that Rives's self-dealing wiped out Steel Tube's working capital, decimated its value, and necessitated sizeable loans. (*See, e.g.*, Reagan 23:14–24:4, 53:23–56:2, 60:10–62:2, 171:10–173:12.) Likewise, other testimony tended to show that Rives channeled Steel Tube's funds to the Lazenby family—increased salary, bonus payment, and insurance benefits—as part of his personal deal to buy shares in the company. (*See, e.g.*, Rives 82:17–84:8, 157:14–17; Lazenby 8:8–24; Reagan 26:21–27:5, 36:11–37:24.)[8]

---

[8] Defendants advance additional, overlapping challenges to the sufficiency of this evidence elsewhere in their briefs. The Court addresses those arguments below.

86. In any event, even if this evidence touched on mismanagement as well as self-dealing, the result would be the same. In response to Potts's motions in limine, Defendants stated their intention to offer evidence that, in their view, would show Rives's sound, good-faith management of Steel Tube. (*See* Order Pl.'s Mots. Limine ¶ 21, ECF No. 200 ["MIL Order"].) The Court denied Potts's motion to exclude such evidence for several reasons but warned Rives that if he attempted "to show the value of his services by offering evidence of decisions he made to benefit Steel Tube, that would likely open the door for Potts to introduce evidence of Rives's alleged mismanagement." (MIL Order ¶ 24.) That's exactly what happened. Defendants cross-examined the first witness about Rives's managerial success, inquiring about his business strategies and efforts to improve sales and profit margins. (*See, e.g.*, Potts 91:16–93:24, 119:16–120:5, 137:20–146:20.) Counsel for Defendants also asked several other witnesses whether Rives's management benefited Steel Tube. (*See, e.g.*, Hatchell 135:7–139:19; Tomlin 33:16–34:12; Reagan 153:17–156:9.) Having opened the door to evidence of Rives's mismanagement, Defendants cannot now protest that it should have been excluded. *See Middleton v. Russell Grp., Ltd.*, 126 N.C. App. 1, 23–24 (1997) ("[W]hen a party first raises an issue, it opens the door to questions in response to that issue and cannot later object to testimony regarding the subject raised.").

87. For similar reasons, Defendants' requested instructions were not appropriate. It would have been inappropriate to instruct the jury not to consider whether Rives's management "was reasonable and prudent" when Defendants, not

Potts, were first to introduce evidence on that subject. In addition, the Court properly instructed the jury that Potts had "the burden to prove by the greater weight of the evidence that Rives entered into one or more conflict-of-interest transactions" and "that Rives proximately caused damage to Steel Tube." (Jury Instrs. at 10, 12.) The Court further instructed the jury that, if it found that one or more transactions were not conflict-of-interest transactions, "then Rives is entitled to a presumption that he acted with due care and on an informed basis as to those transactions." (Jury Instrs. at 12.) These were correct statements of law that appropriately instructed the jury as to the nature of the disputed issues and the elements of a claim for breach of fiduciary duty. Defendants have not shown that the failure to give their proposed limiting instruction resulted in prejudice or was likely to mislead the jury.

### C. Loan Interest

88. The evidence of loan interest discussed in the previous section is also the basis of Defendants' second argument. Defendants argue that the evidence tying the loans to Rives's self-dealing was insufficient and that the Court should have instructed the jury not to consider any evidence relating to payment of interest. (*See* Br. in Supp. New Trial 16–18.)

89. Whether there was a causal connection between Rives's self-interested transactions and the loans at issue is simply an evidentiary dispute. The jury heard expert testimony that Rives's self-dealing severely impaired Steel Tube's working capital and that it covered its losses through loans. (*See, e.g.*, Reagan 23:14–29:7, 53:18–62:2, 97:6–22, 171:10–173:12.) Rives points to evidence that Potts knew about

or approved the loans and that the loans went toward equipment purchases, not self-dealing. (*See, e.g.*, Rives 165:11–169:5.) But Potts offered competing evidence to show that certain purchases Rives claimed to have made with the loan proceeds were fictitious and that Rives covered this up by falsifying information in Steel Tube's books. (*See, e.g.*, Hatchell 33:20–34:2, 39:18–40:12, 41:13–42:2.) Deciding which evidence to believe was for the jury. Certainly, the verdict is not against the greater weight of the evidence.

90. Defendants also fault Reagan's analysis. He failed, they contend, to account for other factors that could have affected Steel Tube's financial position. They take issue, too, with his supposed reliance on financial data that was not introduced into evidence or found in his expert report. The Court rejected similar arguments when it denied Defendants' pretrial *Daubert* motion, observing that Defendants had failed to identify "any principle of economics in conflict with Reagan's analysis" and that Reagan's conclusion was based on opinions concerning capital depletion and diminution in value that Defendants had not challenged. *Potts III*, 2019 NCBC LEXIS 61, at *19–21. Defendants have offered no reason to revisit that ruling.

91. What is more, Reagan testified that he did consider other factors and alternative explanations. To understand the decline in working capital, Reagan looked to industry trends in steel prices and financial performance but did not find a reason for Steel Tube's deteriorating bottom line. (*See* Reagan 58:10–60:7.) And he explained the basis for his opinions, including consideration of original and amended financial statements prepared by Cannon & Company during its investigation after

Rives's departure. (*See* Reagan 19:5–20:14, 176:7–177:24.) Defendants had a full and fair opportunity to cross-examine Reagan on these issues. Whether Reagan had a convincing factual basis for his opinion goes to the credibility and weight of his testimony, not admissibility. *See, e.g., Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2018 NCBC LEXIS 239, at *12 (N.C. Super. Ct. Dec. 27, 2018) (citing cases).

92.    In short, the evidence offered by each side "merely created a question of fact for the jury." *Cooke v. Cooke*, 2005 N.C. App. LEXIS 719, at *12 (N.C. Ct. App. Apr. 5, 2005). Its verdict was "reasonable" and supported by the evidence. *Chalk*, 2019 N.C. App. LEXIS 263, at *16. Further, because there was sufficient evidence linking the interest payments to Rives's misconduct, there was no error in refusing Defendants' request to instruct the jury not to "consider any evidence relating to payment of interest" when evaluating damages. (Br. in Supp. New Trial 18.)

### D. Diminution in Value

93.    Next, Defendants revisit Reagan's calculation of the diminution in Steel Tube's value. Once more, Defendants contend that there was insufficient evidence tying Steel Tube's decline in value to Rives's self-dealing. (*See* Br. in Supp. New Trial 18–20.) But again, the disputed evidence created a jury question. Potts's expert, Reagan, testified extensively on the subject. (*See, e.g.*, Reagan 23:14–24:4, 53:23–55:14, 60:23–62:2, 98:1–20, 99:17–101:11.) The jury was free to discount Rives's competing explanation, and it had sufficient evidence to support its presumed finding that Rives's self-dealing caused these losses.

94. Defendants also contend that Reagan's methodology was faulty because, during cross-examination, he admitted that his calculation contained an error. (*See* Reagan 194:19–200:5.) This miscalculation does not call for a new trial. For one thing, the error and Reagan's explanation for it go to his credibility—a matter for the jury. *See Horne v. Trivette*, 58 N.C. App. 77, 82 (1982) (holding new trial unwarranted when "[t]he changes in [the witness's] testimony . . . affect[ed] his credibility, and it was for the jury to determine whether they believed his inconsistent testimony").

95. For another, Defendants suffered no prejudice. Through several rounds of cross-examination and redirect, Reagan testified that Steel Tube's diminution in value was *greater* than he had originally calculated. But rather than seek the corrected, higher amount, Potts asked the jury to award only the *lesser* amount as damages. (*See* Reagan 203:9–21, 211:13–17, 212:24–213:25.) Thus, the error favored Defendants.

96. It also merits mention that Defendants did not depose Reagan during discovery or produce their own expert to rebut his testimony. Nor did they challenge his calculation of diminution in value or his underlying methodology in their pretrial *Daubert* motion. *See Potts III*, 2019 NCBC LEXIS 61, at *20 (observing that Defendants had not objected to Reagan's opinion on diminution in value, "much less identif[ied] any flaw in the methodology used to calculate these figures"). And at no point have Defendants argued that damages in the form of diminished value are too speculative, too remote, or otherwise unavailable as a matter of law.

97. One more argument deserves mention. In a single paragraph without citations, Defendants contend that the evidence of diminished value led to a double recovery. (*See* Br. in Supp. New Trial 20.) This, too, is unpersuasive. Defendants do not point to specific evidence of double counting, do not suggest that they attempted to cross-examine Reagan on the issue, and offered no rebuttal expert testimony to support their position. In addition, even if Reagan had double counted, his purported error was not "apparently embraced by the jury," as Defendants contend. (Br. in Supp. New Trial 20.) The jury awarded Potts about $500,000 less than he sought, and the Court sees no basis to conclude that the verdict amounted to a double recovery. *See Dafford v. JP Steakhouse LLC*, 210 N.C. App. 678, 687 (2011) ("[W]hether plaintiff's calculation is correct or not is irrelevant since the jury, as the trier of fact, may award damages based on the evidence they find credible and may disregard the evidence they did not find credible."); *Von Pettis Realty, Inc. v. McKoy*, 135 N.C. App. 206, 211 n.4 (1999) (holding that because the jury's award was substantially less than the total amount requested, the exact amount of special and consequential damages awarded was "not material").

### E. Mike Lazenby's Compensation

98. Defendants also challenge the sufficiency of the evidence concerning damages resulting from compensation paid to Mike Lazenby. They reiterate their view that the compensation was unrelated to Rives's self-dealing and further argue that Rives was not at fault because Potts signed Mike's employment agreement. (*See* Br. in Supp. New Trial 21–22.)

99. The evidence supports the verdict. Among other things, there was evidence tending to show that Mike's compensation was part of Rives's scheme of self-dealing. When Rives first acquired Roy Lazenby's shares, he promised to "protect" Mike. (Rives 82:23–83:9.) This protection took the form of an employment agreement that guaranteed Mike a raise and a bonus not dependent on job performance. (*See* Rives 83:10–16, 84:3–8; Hatchell 103:21–107:3.) From this evidence, the jury could have inferred that Rives used Steel Tube's assets to satisfy a personal commitment, just as he had used Steel Tube's assets to pay for his purchase of the shares.

100. In addition, other evidence suggests that Mike aided Rives with other self-interested transactions, including those involving Elite Tube. Notably, Rives ensured that Mike received a commission—in addition to the raise and bonus—that was to be paid by Elite Tube. (*See* Rives 100:9–19; *see also* Berrier 12:17–13:6.) The jury could have inferred that Rives increased Mike's pay and gave him a bonus to induce him to assist in a scheme of self-dealing and deception.

101. Although Defendants argue that Potts knew about and signed the employment agreement, the evidence was contested. Potts was unaware, for example, that benefits given to Mike would satisfy a condition of Rives's share purchase from Roy Lazenby. (*See* Rives 82:23–83:9.) Thus, the jury may have concluded that Rives did not disclose all material facts about the transaction. *See* N.C.G.S. § 55-8-31(a)(1), (2). In addition, Hatchell participated in discussions concerning the new employment agreement and testified that it was not to include a guaranteed bonus. (*See* Hatchell 103:12–19.) As further support, Potts introduced

into evidence two versions of the agreement—an unsigned version allowing a potential bonus and a signed version promising a guaranteed bonus—and highlighted irregularities with the signature page, contending that there was an implication of tampering. (*See* Hatchell 104:14–107:7, 107:19–21.) The jury was entitled to weigh this evidence in connection with the credibility of each witness.

102. And because this evidence was properly admitted, there was no error in rejecting Defendants' proposed instruction that the jury should not consider any request for damages resulting from Mike Lazenby's employment contract. Also, given the disputed evidence, Defendants' description of the agreement as an "employment contract entered into between Avalon Potts and Michael Lazenby" was inappropriately argumentative. (Br. in Supp. New Trial 22.)

### F. KEL Transactions

103. At trial, Reagan testified that Steel Tube incurred almost $85,000 in damages due to losses related to the trucking services agreement with KEL. (*See* Reagan 94:2–5.) Defendants argue that there was insufficient evidence to support these damages. They say that Reagan failed to consider various factors—for example, the market value of shipping charges, brokerage fees imposed by KEL, and potential cost savings to Steel Tube—and that the oversight rendered his calculations "too conjectural" to support the verdict. (Br. in Supp. New Trial 20–21.)

104. As Potts correctly observes, Defendants waived any objection to Reagan's testimony about KEL. (*See* Opp'n New Trial 13.) In lieu of objecting at trial, Defendants' counsel acknowledged that Reagan's testimony concerning "[e]xcessive

payments to KEL . . . will be a subject to [sic] cross-examination." (Reagan 65:4–6; *see also, e.g.*, Reagan 35:6–36:10 (no objection to KEL-related testimony).) It is too late now to contend that Reagan's testimony should have been excluded. *See, e.g.*, *State v. Barton*, 335 N.C. 696, 709–10 (1994).

105. In any event, the evidence supports the verdict. Reagan testified that, before engaging KEL, Steel Tube recovered its shipping costs and earned a profit through a delivery charge. Under the KEL contract, however, Steel Tube paid fees rather than earning a return. The switch led to a significant net loss for Steel Tube. (*See, e.g.*, Reagan 35:15–36:10, 146:18–147:15, 150:8–152:22.) On cross-examination, Defendants asked Reagan about the factors identified in their briefing. Reagan answered those questions and explained how he considered each factor or why, in his view, a given factor was irrelevant. (*See, e.g.*, Reagan 148:24–149:9, 150:21–151:14, 153:3–156:16.) Because Defendants offered no expert of their own, Reagan's testimony was unrebutted. Considering the entire record, the verdict was not "against the greater weight of the evidence" and does not threaten a "substantial miscarriage of justice." *Justus*, 371 N.C. at 825 (citations and quotation marks omitted); *see also Boykin*, 201 N.C. App. at 561.

106. Defendants also object to the jury instructions as to the law governing conflict-of-interest transactions. They contend that the Court should have instructed the jury that "a familial relationship with another person who is an officer or director with the other party to a corporate transaction does not, by itself, give rise to a conflict of interest." (Br. in Supp. New Trial 21.)

107. This argument is unconvincing. The Court instructed the jury that "[a] conflict-of-interest transaction is defined as a transaction with the corporation in which the director or officer of the corporation has a direct or indirect interest." (Jury Instrs. 10.) The Court further instructed the jury that "[t]he test of whether a director or officer has a direct interest in a transaction is a matter of common sense" and that an indirect interest may exist if, for example, "another entity in which [he] has a material financial interest is a party to the transaction." (Jury Instrs. 11.) These instructions mirror the governing statute. *See* N.C.G.S. § 55-8-31(a), (b) (addressing conflicts of interest for directors). The statute does not define a direct conflict of interest. But as this Court and leading commentators have observed, what makes a direct conflict "is left to 'common sense.'" *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at *27 (N.C. Super. Ct. Oct. 19, 2007) (quoting Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* 15-3 (7th ed. 2006)). Thus, the instructions correctly stated the law.

108. Defendants' proposed instruction, on the other hand, does not accurately state the law. Nothing in the text of the statute states that a conflict cannot arise from a familial relationship. *See* N.C.G.S. § 55-8-31. Moreover, section 55-8-31 is based on a model act, whose drafters clarified in an associated comment that "a director should normally be viewed as interested in a transaction if he or the immediate members of his family have a financial interest in the transaction or a relationship with the other parties to the transaction *such that the relationship might reasonably be expected to affect his judgment* in the particular matter in a manner

adverse to the corporation." *Id.* § 55-8-31, cmt. 5 (emphasis added); *see also Battleground Veterinary Hosp.*, 2007 NCBC LEXIS 33, at \*27. Defendants look past the statutory text and related commentary, relying instead solely on dictum in a case involving a different issue and in a different procedural posture. *See Geitner v. Mullins*, 182 N.C. App. 585, 591–93 (2007) (addressing director votes, not conflicted transactions with corporation); *see also id.* at 596 (Geer, J., concurring in the result) (noting that majority's discussion of conflict-of-interest transactions was unnecessary to decision).

109. Had the Court instructed the jury that familial relationships always result in a conflict, it would have been error. But that is not what the Court instructed. And it was not error to allow the jury to consider familial relationships when deciding whether Rives's actions presented a conflict of interest. *See Godfrey*, 165 N.C. App. at 79–80 (holding that trial court did not err in refusing to give defendant's requested jury instruction when "the trial court's instruction, considered in its entirety, encompassed the substance of the law").

## G. Elite Tube Transactions

110. Next, Defendants object to the admission of evidence involving transfers of money and equipment from Steel Tube to Elite Tube. Specifically, Defendants contend that the admission of evidence involving equipment known as a roll former and a tube bender was inconsistent with the pretrial *Daubert* and summary judgment decisions. They further contend that the jury should have been instructed not to consider damages related to these transactions. (*See* Br. in Supp. New Trial 22–24.)

111. These arguments do not merit a new trial. First, as Potts points out, evidence related to the equipment was relevant to matters other than damages—including at least Rives's intent, motive, and overall plan. (*See* Opp'n New Trial 17.) Defendants do not argue otherwise. (*See* Br. in Supp. New Trial 23–24.) Thus, admitting the evidence was not error.

112. Second, there was no inconsistency between the pretrial and trial rulings. Long before trial, Potts settled his claims against Elite Tube, and as a result, Steel Tube recovered $120,000 in funds and equipment that Rives had transferred to Elite Tube. (*See* Order Approving Voluntary Dismissal ¶ 4, ECF No. 95.) At summary judgment, the Court made clear that Potts was not entitled to a double recovery but noted that the record was unsettled and that Potts had forecast evidence of additional damages beyond what had been recovered. *See Potts II*, 2019 NCBC LEXIS 30, at *19. In its pretrial *Daubert* order, the Court reinforced that decision by excluding several of Reagan's opinions—without objection by Potts—that related to damages already recovered from Elite Tube. *See Potts III*, 2019 NCBC LEXIS 61, at *17–18. At trial, consistent with these decisions, Reagan gave expert testimony regarding depletion of working capital, diminution of value, and loans and resulting interest—none of which had been recovered in the settlement with Elite Tube. (*See, e.g.*, Reagan 53:23–56:2, 60:8–22.) The admission of this evidence did not contravene pretrial rulings, and the jury's award did not result in a double recovery.

113. Third, Defendants' proposed limiting instructions were not appropriate. They asked the Court to direct the jury "not to consider *any damages* arising from"

the transfer of equipment to Elite Tube and also "not to consider *any damages* for the purchase of the tube bender that was discussed, namely $120,000.00." (Br. in Supp. New Trial 23 (emphases added).)  As discussed, nothing barred Potts from seeking additional damages—including damages related to diminution in value and loan interest—that Steel Tube had not recovered through the settlement with Elite Tube.

114.  Fourth, there was little likelihood of jury confusion.  At no point did Potts ask the jury to award the $120,000 that Steel Tube had received from Elite Tube. And in fact, the parties presented the jury with a stipulation that Steel Tube had settled its claims against Elite Tube for $120,000, informing the jury that this amount was no longer at issue.  (*See* Potts 108:13–24; *see also* Berrier 21:18–23.)  Thus, the jury was correctly informed, and it is presumed to have adhered to its instructions, including stipulations of evidence.  *See State v. Cummings*, 352 N.C. 600, 623 (2000). Defendants' limiting instructions, on the other hand, would not have clarified the issues for the jury and would have improperly directed the jury to limit its consideration of damages supported by the evidence.

## H. Duplicative Damages

115.  The jury returned a verdict with a single damages award for Rives's breach of fiduciary duty, constructive fraud, and conversion, and a separate award for Rives's fraud.  (*See* Verdict Sheet, Issue Nos. 4, 5(b).)  Defendants argue that all the claims are based on the same underlying facts and that, because the verdict sheet "did not separate the amount of damages under each claim," the Court cannot determine "which claims the verdict was awarded for or how damages were measured."  (Br. in

Supp. New Trial 24.)  As a result, they contend, it is unclear whether the damages for fraud are duplicative of the damages for constructive fraud, breach of fiduciary duty, and conversion.

116.  If there was an error, Defendants invited it.  In their proposed verdict sheet, Defendants did not include a separate damages issue for each claim.  Rather, their proposed verdict sheet had the same structure as the one proposed by Potts and the one adopted by the Court: one line for damages based on breach of fiduciary duty, constructive fraud, and conversion, and a second line for damages based on fraud. (*See* Defs.' Proposed Verdict Sheet Issue Nos. 5, 9, ECF No. 175.)  It is fundamental that "[a] party may not complain of action which he induced." *Frugard v. Pritchard*, 338 N.C. 508, 512 (1994); *see also Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 23 (1992) ("Because [defendant] did not object to the verdict form, and indeed consented to it, it will not be heard to complain on appeal.").  Moreover, lump sum awards are acceptable and do not justify a new trial.[9]

---

[9] *See also, e.g.*, *Abernathy v. Ralph Squires Realty Co.*, 55 N.C. App. 354, 358 (1982) ("The prohibition against double recovery should not be read to mean that the two theories of recovery cannot be submitted to the jury for its determination of the basis, if any, of liability."); *Jastremski v. United States*, 737 F.2d 666, 672 (7th Cir. 1984) ("The failure to divide the lump sum award into discrete elements of recovery does not warrant reversal."); *Greenwood Ranches, Inc. v. Skie Constr. Co.*, 629 F.2d 518, 521 (8th Cir. 1980) (noting that "a plaintiff is not entitled to a separate compensatory damage award under each legal theory," but rather "is entitled only to one . . . award if liability is found on any or all of the theories involved"); *Dimensions Med. Ctr., Ltd. v. Aetna Life Ins. Co.*, 1997 U.S. Dist. LEXIS 5595, at *11 n.1 (N.D. Ill. Apr. 22, 1997) ("Because there was a lump sum verdict in this case, however, it is impossible to determine to what extent the award was based on any particular claim. . . . This result is a byproduct of the defendant's failure to submit or request separate and/or itemized verdict forms for each claim.  By doing so, defendant took the risk that the award would be uninterpretable when contesting individual claims.  Moreover, a lump-sum award is not a basis, as defendant urges, for granting a new trial.").

117. In their reply brief, Defendants make a different argument: that the Court should have itemized the disputed transactions under each issue. They contend that it was necessary to list each transaction under each claim to avoid the potential for a double recovery. (*See* Reply Br. New Trial 8–9, ECF No. 224.) This argument is untimely. As this Court has observed, "our courts disfavor arguments made for the first time in a reply brief." *Brown*, 2020 NCBC LEXIS 134, at *25. In any event, the argument makes no sense. Defendants contend that all claims are based on the same underlying transactions. Itemizing those transactions for each claim would not have given any additional guidance to the jury, nor would it have guarded against a double recovery. Furthermore, the itemized list of transactions proposed by Defendants was incomplete and assumed the truth of their view of the evidence.[10] As discussed elsewhere in this opinion, the evidence supporting the jury's verdict was broader than Defendants contend.

118. Finally, mere uncertainty about how the jury made its calculation is not a basis for a new trial. Had the jury awarded more than Potts requested, there might be grounds for concern. But the jury awarded far less than Potts sought. In addition, its awards were not identical (which might have suggested duplication) but appear to have been the product of careful consideration of the evidence. Indeed, every indication is that the jury did not give a double recovery but instead allocated total damages among the claims. It may be unclear how the jury made that allocation, but

---

[10] Notably, the Court properly identified the property in dispute for the conversion claim in keeping with the pattern jury instruction for that claim. (*Compare* N.C.P.I.–Civil 806.00, with Jury Instructions 13–14.)

the record supports the overall award, and "it is not for this Court to second-guess the means by which the jury calculated" it. *Lacey v. Kirk*, 238 N.C. App. 376, 394 (2014) (cleaned up).

## I. Punitive Damages

119. Rives & Associates reiterates its view that no evidence supported the jury's award of punitive damages against it. (*See* Br. in Supp. New Trial 25–26.) The Court disagrees. For the reasons discussed above, the evidence supports the jury's verdict, which was not against the greater weight of the evidence.

120. Rives & Associates also contends that the Court should have instructed the jury that the firm "could not be liable for any act or omission of Rives unless it was undertaken in his capacity as an employee and partner of [Rives & Associates], rather than in his individual capacity." (Br. in Supp. New Trial 26.) Not so. Consistent with the pattern instructions, *see* N.C.P.I.–Civil 810.96, the Court instructed the jury regarding an award of punitive damages that, "[a]s to Rives & Associates, the third thing Potts must prove is that the officers, directors, or managers of Rives & Associates participated in or condoned the fraud or willful or wanton conduct." (Suppl. Jury Instrs. 3.) This instruction correctly made no reference to Rives and followed the governing statute. *See* N.C.G.S. § 1D-15(c); *see also State v. Garcell*, 363 N.C. 10, 49 (2009) ("Use of the pattern instructions is encouraged . . . ."); *Henry v. Knudsen*, 203 N.C. App. 510, 519 (2010) (observing that use of the pattern instructions is "the preferred method of jury instruction" (citation and quotation marks omitted)); *Carrington v. Emory*, 179 N.C. App. 827, 829 (2006) (same).

121. Moreover, the Court's instructions did not permit the jury to find Rives & Associates liable for Rives's activities in his capacity as an officer and director of Steel Tube. Rather, as to the claim for professional negligence at the compensatory phase, the Court instructed the jury that Rives & Associates could be held liable for Rives's conduct only if he was acting as an agent of the firm. (*See* Jury Instrs. 20.) The jury presumably made that finding, and Rives & Associates has not challenged its liability for professional negligence.

122. Finally, there was no prejudice. The Court's instruction was a correct statement of the law and therefore did not "fail[ ] to encompass the substance of the law" or mislead the jury. *Godfrey*, 165 N.C. App. at 78. Because the jury is presumed to have followed the Court's instructions, there was no risk of confusion or prejudice. *See Cummings*, 352 N.C. at 623; *State v. Hoffman*, 349 N.C. 167, 185 (1998).

### J. Notification of Disposition of Collateral

123. Finally, Rives returns to the public sale of his shares by Avalon1. The issues and arguments are the same as those in the JNOV motion. (*See* Br. in Supp. New Trial 26–27.) Having already concluded that the issue of commercially reasonable notice was properly submitted to the jury, the Court further concludes that a new trial is not warranted.

## IV.
## CONCLUSION

124. For all these reasons, Defendants' motions for judgment notwithstanding the verdict and for a new trial are **DENIED**.

**SO ORDERED**, this the 5th day of November, 2021.

 /s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases